18 U.S. 156 (____)
5 Wheat. 156
The JOSEFA SEGUNDA: CARRICABURA et al., Claimants.
Supreme Court of United States.

*158 March 9th. C.J. Ingersoll, for the appellants and claimants.
*162 March 14th, 1820. LIVINGSTON, Justice, delivered the opinion of the court, and after stating the facts, proceeded as follows:
The third count *352] of the libel is the only one *that has any bearing on the present case. It alleges a violation of the 7th section of an act of congress, prohibiting the importation of slaves into the United States, after the first day of January, in the year 1808, and which passed the 3d of March 1807.
By this section it is enacted, "That if any ship or vessel shall be found, from and after the first day of January 1808, in any river, port, bay or harbor, or on the high seas, within the jurisdictional limits of the United States, or hovering on the coast thereof, having on board any negro, mulatto or person of color, for the purpose of selling them as slaves, or with intent to land the same in any port or place within the jurisdiction of the United States, contrary to the prohibition of this act, every such ship or vessel, together with her tackle, apparel and furniture, and the goods or effects which shall be found on board the same, shall be forfeited to the use of the United States, and may be seized, prosecuted and condemned, in any court of the United States having jurisdiction thereof. And the proceeds of all such ships and vessels, their tackle, apparel and furniture, and the goods and effects on board of them, which shall be so seized, prosecuted and condemned, shall be divided equally between the United States and the officers and men who shall make such seizure, or bring the same into port for condemnation, and the same shall be distributed in like manner as is provided by law for the distribution of prizes taken from an enemy: provided, that the officers *353] and men to be entitled to one-half of the proceeds aforesaid, *shall safe keep every negro, mulatto or person of color, found on board of any ship or vessel so seized by them, and deliver them to such persons as shall be appointed by the respective states to receive the same," &c. (2 U.S. Stat. 428.)
It is not denied, that the brig Josefa Segunda, shortly before her seizure, had been hovering on the coast of the United States, having on board a large number of persons of the description of those whose importation into this country is prohibited by the act: nor can there be any doubt, from the situation and circumstances under which she was found, and the manner in which she came within the jurisdictional limits of the United States, which appears to have been a voluntary act on the part of the prize-master, that there is at least primâ facie evidence of an intention to dispose of these people as slaves, or to land them in some port or place within the jurisdiction of the United States.
The claimants, aware of the necessity of accounting for circumstances, which, unexplained, could not but prove fatal to their interests, contend, in the first place, that the coming into the Mississippi was a matter of necessity, produced by the perilous situation of the vessel, and the famishing condition of the people on board: and that, therefore, neither she nor her cargo can be obnoxious to the provisions of the act of congress. If the claim be not sustained on this plea; it is insisted, in the next place, that the capture being illegal or piratical, the original owners cannot be affected by any of *163 the acts of the prize-crew; and, *in the third place, it is asserted, that the *354 vessel having been ransomed, and taken out of the hands of the captors, the claimants restored to all their original rights, unimpaired by any acts on the part of the former. Each of these claims for restitution will now be examined.
When any act is done, which, of itself, and unexplained, is a violation of law, and a party, to extricate himself, or his property, from the consequences of it, resorts to the plea of necessity or distress, the burden of proof is not only thrown upon him, but when the temptation to infringe the law is great, and the alleged necessity, if real, can be fully and easily established, no court should be satisfied with anything short of the most convincing and conclusive testimony. The proofs before us are so far from being of this character, that we look in vain for testimony of any serious disaster having befallen this vessel, in her voyage from the Island of Cuba to the Mississippi, or for a calamity of any kind, which might not have been averted or prevented, had the master seriously and honestly endeavored to reach the Island of Marguerita, which is now pretended to have been her real port of destination. That neither he, nor his employer, should have any great solicitude for the arrival of the prize at Marguerita, is easily accounted for, when it is recollected, that this island, as well from its small extent, being not more than forty miles in length, and perhaps, not more than half as broad, as from the scantiness and poverty of its population, could afford but a wretched, if *any market at all for slaves; while at New Orleans, [*355 each of them would produce the extravagant and tempting sum of $1000. It has not escaped the observation of the court, that the General Arismendi, made the passage from Marguerita to the place of capture, off the Island of St. Domingo, in the short space of nine days; for the owner's letter of instructions to the captain bears date, at Marguerita, on the 2d day of February 1818, and on the 11th of the same month, the capture was made; and yet, with the important fact before us, it is seriously contended, that a voyage which had just been made in nine days, could not be performed back again in six weeks. This is a possible case; but we ought not to be expected, on slight grounds, to believe, that a vessel, after leaving the Island of Cuba, in the latter end of February, should, on the 18th of April following, be found, not only several miles farther from her destined port than at the time of sailing, but that she had pursued this circuitous route in search of provisions: a story so improbable could hardly, under any circumstance, be entitled to belief; but it becomes absolutely incredible, when so many ports, more contiguous, and where supplies might easily have been obtained, were passed in her way to the Balize, without a single effort to procure a supply at any of them. Why not go to Kingston, in Jamaica, which was in the neighborhood of the place where the capture was made, and to which port, the privateer went, after making the capture? Her not going there can be accounted for on no supposition other than that of her being well supplied *with provisions, at the time of her leaving Cuba. It is vain, then, [*356 to urge a plea, which is contradicted by the internal evidence of the case.
If, however, it can be made out, that an attempt was really made to reach Marguerita, which was frustrated by adverse winds, or by any one of those disasters which so frequently occur on the ocean, or that the Josefa was forced, by stress of weather, so very far from the track of a direct voyage *164 to that island, the claimant might still contend, that their plea of necessity had been made out. But on this subject, there is an impenetrable obscurity, which it was their duty to remove. What winds, or what weather, were encountered, we are not informed. No log-book, from which alone, accurate and safe knowledge might be derived, is produced. A journal of that kind was not even kept, a circumstance which, of itself, excites a suspicion, which none of the testimony in the cause is calculated to dispel. But it is not necessary to pursue this inquiry further, nor to take notice of several minor circumstances which are relied on, and which so far from making out a case of real distress, only serve to confirm the view which has already been taken of the other evidence, and leave no reasonable doubt of the whole story being a fiction; or that the want of provisions, if real, at the time of seizure, was produced by a voluntary protraction of the voyage for the purpose, and with the intent of violating the law on which the present libel is founded. If, on testimony so vague, so contradictory, and affording so little satisfaction, this court should award restitution, all the acts of congress *357] which *have been passed to prohibit the importation of slaves into the United States, may as well be expunged from the statute book; and this inhuman traffic, for the abolition of which the United States have manifested an early and honorable anxiety, might, under the most frivolous pretexts, be carried on, not only with impunity, but with a profit which would keep in constant excitement the cupidity of those who think it no crime to engage in this unrighteous commerce. In the execution of these laws, no vigilance can be excessive, and restitution ought never to be made, but in cases which are purged of every intentional violation, by proofs the most clear, the most explicit and unequivocal.
But the claimants, not relying exclusively on the plea of necessity, contend, that the capture being piratical, and by a vessel having no commission, they ought not to be injured by any acts of the prize-master, which may be deemed infractions of the laws of the United States. It would, indeed, be unreasonable and unjust, to visit upon the innocent owners of this property, the sins of a pirate; and were this allegation made out, the court would find no difficulty in making the restitution which is asked for. But is it so? was the General Arismendi a piratical cruiser? The court thinks not. Among the exhibits, is the copy of a commission, which is all that, in such a case, can be expected, which appears to have been issued under the authority of the republic of Venezuela. This republic is composed of the inhabitants of a portion of the dominions of Spain, in South *358] America, who have *been, for some time past, and still are, maintaining a contest for independence with the mother country. Although not acknowledged by our government, as an independent nation, it is well known, that open war exists between them and his Catholic Majesty, in which the United States maintain strict neutrality. In this state of things, this court cannot but respect the belligerent rights of both parties; and does not treat as pirates, the cruisers of either, so long as they act under, and within the scope of, their respective commissions. This capture, then, having been made under a regular commission of the government of Venezuela, the captors acquired thereby a title to the vessel and cargo, which could only be divested by re-capture, or by the sentence of a prize-court of the country under whose commission the capture was made. The courts *165 of neutral nations have no right to interfere, except in cases which do not embrace the present capture. The captors, therefore, at the time of the violation of our laws, must be regarded as the lawful owners of the property, and as capable of working a forfeiture of it, by any infraction on their part of the municipal regulations of the United States. The property, in the present case, not only belonged, at the time, to the captors, in virtue of the capture which they had made, but it is evident from the testimony and admissions in this cause, that it was owned, at the time of capture, by an enemy, and that a condemnation in a prize court of Venezuela was inevitable.
As little foundation is there for resting a claim to restitution on the ransom, which it is alleged took *place, of this vessel and cargo. This [*359 ransom, whether real or pretended, whether absolute or contingent (about which, doubts may well be entertained), cannot affect the rights of the United States. The forfeiture having attached, before any ransom took place, could not be divested by any act between parties, conusant as these were, not only of the fact that a seizure had taken place, for a violation of law, but that legal proceedings had been instituted, and were then carrying on, to obtain a sentence of condemnation founded on such violation.
Decree affirmed, with costs.[1]
NOTES
[1] For a further decision in this case, see 10 Wheat. 312.