# UNITED STATES *v.* ARJONA.

CERTIFICATE OF DIVISION FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

Submitted January 3, 1887. — Decided March 7, 1887.

It is within the constitutional power of Congress to enact laws to provide for the punishment of the offences of counterfeiting notes of a foreign bank or corporation, or of having in possession a plate from which may be printed counterfeits of the notes of a foreign bank or corporation; and it is not necessary to allege in an indictment for such an offence, or to show, that the notes of such a bank or corporation are notes of money or issue of a foreign Government, sovereign, or

power; nor is it necessary to allege that the offence is " an offence against the Law of Nations."

The counterfeiting of foreign securities, whether national or corporate, which have been put out under sanction of public authority at home — especially the counterfeiting of bank notes and bank bills — is an offence against the Law of Nations.

The United States being bound to protect a right secured by the Law of Nations to another nation or its people, Congress has the constitutional power to enact laws for that purpose; but this does not prevent a State from enacting laws to punish the same act when it may be an offence against the authority of the state as well as that of the United States.

INDICTMENT under the act of May 16, 1884, 23 Stat. 22, to prevent and punish the counterfeiting within the United States of notes, bonds, and other securities of foreign governments. The court below certified a Division in Opinion on several points. The case is stated in the opinion of the court.

*Mr. Attorney General* for plaintiff.

*Mr. George W. Wingate* and *Mr. Augustus A. Levey* for defendant.

MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

This is an indictment containing three counts against Ramon Arjona, for violations of §§ 3 and 6, of the act of May 16, 1884, c. 52, 23 Stat. 22, " to prevent and punish the counterfeiting within the United States of notes, bonds, and other securities of foreign Governments." The first and second counts were found under § 6 of the statute, and the third under § 3.

The statute makes the following things criminal :

1. SEC. 1. Forging or counterfeiting within the United States, with intent to defraud, " any bond, certificate, obligation, or other security of any foreign Government, issued or put forth under the authority of such foreign Government, or any treasury note, bill, or promise to pay issued by such foreign Government, and intended to circulate as money either by law, order, or decree of such foreign Government."

2. SEC. 2. Knowingly, and with intent to defraud, uttering,

passing or putting off in payment or negotiation, within the United States, any forged or counterfeit bonds, &c., such as are described in § 1.

3. SEC. 3. Falsely making, forging or counterfeiting within the United States, with intent to defraud, or knowingly assist-ing therein, "any bank note or bill issued by a bank or other corporation of any foreign country, and intended by the law or usage of such foreign country to circulate as money, such bank or corporation being authorized by the laws of such country."

4. SEC. 4. Knowingly uttering, passing, putting off or ten-dering in payment, within the United States, with intent to defraud, any such false or counterfeited bank note or bill as is mentioned in § 3, whether forged or counterfeited in the United States or not.

5. SEC. 5. Having in possession any forged or counterfeit in-struments mentioned in the preceding sections, with intent to utter, pass, or put them off, or to deliver them to others, with the intent that they may be uttered or passed.

6. SEC. 6. Having in possession "any plate, or any part there-of, from which has been printed or may be printed any coun-terfeit note, bond, obligation, or other security, in whole or in part, of any foreign Government, bank, or corporation, except by lawful authority;" or using such plate, or knowingly per-mitting or suffering "the same to be used, in counterfeiting such foreign obligations, or any part thereof;" or engraving, or causing or procuring to be engraved, or assisting "in en-graving, any plate in the likeness or similitude of any plate designed for the printing of the genuine issues of the obliga-tions of any foreign Government, bank, or corporation;" or printing, photographing, or in any other manner making, executing, or selling, or causing "to be printed, photographed, made, executed, or sold," or aiding "in printing, photograph-ing, making, executing, or selling any engraving, photograph, print, or impression in the likeness of any genuine note, bond, obligation, or other security, or any part thereof, of any foreign Government, bank, or corporation;" or bringing "into the United States . . . any counterfeit plate, engraving, pho-

tograph, print, or other impressions of the notes, bonds, obligations, or other securities of any foreign Government, bank, or corporation."

The first count of the indictment charges Arjona with having "in his control and custody a certain metallic plate from which there might then and there be printed in part a counterfeit note in the likeness and similitude in part of the notes theretofore issued by a foreign bank, to wit, the bank known as El Banco del Estado de Bolivar, which said bank was then and there a bank authorized by the laws of a foreign state, to wit, the state of Bolivar, said state being then and there one of the states of the United States of Columbia."

In the second count, he is charged with having caused and procured "to be engraved a certain metallic plate in the likeness and similitude of a plate designated for the printing of the genuine issues of the obligations of a foreign bank, that is to say, of the bank notes of the bank known as El Banco del Estado de Bolivar, the same being then and there a bank authorized by the laws of a foreign state, to wit, the state of Bolivar, said state being then and there one of the states of the United States of Columbia."

In the third count, the charge is that he, "unlawfully and with intent to defraud, did cause and procure to be falsely made a certain note in the similitude and resemblance of the notes theretofore issued by a bank of a foreign country, to wit, the bank known as El Banco del Estado de Bolivar, the same being then and there a bank authorized by the laws of one of the states of the United States of Columbia, that is to say, the state of Bolivar, and the notes issued by the said bank being then and by the usage of the said state of Bolivar intended to circulate as money."

To this indictment a demurrer was filed, and the judges holding the court have certified that at the hearing the following questions arose, upon which their opinions were opposed:

1. Whether the third section of the statute is constitutional.

2. Whether the sixth section is constitutional so far as it relates to "foreign banks and corporations."

3. Whether the counterfeiting within the United States of

the notes of a foreign bank or corporation can be constitutionally made by Congress an offence against the law of nations.

4. Whether the obligations of the law of nations, as referred to in the Constitution of the United States, include the punishment of counterfeiting the notes of a foreign bank or corporation, or of having in possession a plate from which may be printed counterfeits of the notes of foreign banks or corporations, as mentioned in the third and sixth sections, " unless it appear or is alleged in the indictment that the notes of said foreign bank or corporation are the notes or money of issue of a foreign Government, prince, potentate, state, or power."

5. Whether, if there is power to "so define the law of nations " as to include the offences mentioned in the third and sixth sections, it is not necessary, in order " to define " the offence, that it be declared in the statute itself " to be an offence against the law of nations."

6. Whether the indictment is sufficient in law.

The fourth of the questions thus stated embraces the 4tn, 5th, 6th, 7th, and 8th of those certified, and the fifth embraces the 9th and 10th.

Congress has power to make all laws which shall be necessary and proper to carry into execution the powers vested by the Constitution in the Government of the United States, Art. I, sec. 8, clause 18; and the Government of the United States has been vested exclusively with the power of representing the nation in all its intercourse with foreign countries. It alone can "regulate commerce with foreign nations," Art. I, sec. 8, clause 3; make treaties and appoint ambassadors and other public ministers and consuls. Art. II, sec. 2, clause 2. A state is expressly prohibited from entering into any "treaty, alliance, or confederation." Art. I, sec. 10, clause 1. Thus all official intercourse between a state and foreign nations is prevented, and exclusive authority for that purpose given to the United States. The national government is in this way made responsible to foreign nations for all violations by the United States of their international obligations, and because of this, Congress is expressly authorized " to define and punish . . . offences against the law of nations." Art. I, sec. 8, clause 10.

The law of nations requires every national government to use " due diligence " to prevent a wrong being done within its own dominion to another nation with which it is at peace, or to the people thereof; and because of this the obligation of one nation to punish those who within its own jurisdiction counterfeit the money of another nation has long been recognized.  Vattel, in his Law of Nations, which was first printed at Neuchâtel in 1758, and was translated into English and published in England in 1760, uses this language : " From the principles thus laid down, it is easy to conclude, that if one nation counterfeits the money of another, or if she allows and protects false coiners who presume to do it, she does that nation an injury." [1]  When this was written money was the chief thing of this kind that needed protection, but still it was added: " There is another custom more modern, and of no less use to commerce than the establishment of coin, namely, *exchange*, or the traffic of bankers, by means of which a merchant remits immense sums from one end of the world to the other, at very trifling expense, and, if he pleases, without risk.  For the same reason that sovereigns are obliged to protect commerce, they are obliged to support this custom, by good laws, in which every merchant, whether citizen or foreigner, may find security.  In general, it is equally the interest and duty of every nation to have wise and equitable commercial laws established in the country." [2].  Vattel, Law of Nations, Phil. ed. 1876, Book I, chap. 10, pages 46, 47.  In a note by Mr. Chitty in his London edition of 1834 it is said : " This is

---

[1] § 108. Des principes que nous venons d'établir, il est aisé de conclure, que si une Nation contrefait la monnaie d'une autre, ou si elle souffre et protége les faux-monnayeurs qui osent l'entreprendre, elle lui fait injure.

[2] Il est un autre usage plus moderne, et non moins utile au commerce que l'établissement de la monnaie : c'est le *change*, ou le négoce des banquiers, par le moyen duquel un marchand remet d'un bout du monde à l'autre des sommes immenses, presque sans frais, et, s'il le veut, sans péril.  Par la même raison que les souverains doivent protéger le commerce, ils sont obligés de soutenir cet usage par de bonnes lois, dans lesquelles tout marchand, étranger ou citoyen, puisse trouver sa sûreté.  En général, il est également de l'intérêt et du devoir de toute Nation, d'établir chez elle de sages et justes lois de commerce.

a sound principle, which ought to be extended so as to deny effect to any fraud upon a foreign nation or its subjects." Id. 47, note 50.

This rule was established for the protection of nations in their intercourse with each other. If there were no such intercourse, it would be a matter of no special moment to one nation that its money was counterfeited in another. Its own people could not be defrauded if the false coin did not come among them, and its own sovereignty would not be violated if the counterfeit could not under any circumstances be made to take the place of the true money. But national intercourse includes commercial intercourse between the people of different nations. It is as much the duty of a nation to protect such an intercourse as it is any other, and that is what Vattel meant when he said: "For the same reason that sovereigns are obliged to protect commerce, they are obliged to support this custom;" "namely, *exchange*, or the traffic of bankers, by means of which a merchant remits immense sums from one end of the world to the other," "by good laws, in which every merchant, whether citizen or foreigner, may find security."

In the time of Vattel certificates of the public debt of a nation, government bonds, and other government securities, were rarely seen in any other country than that in which they were put out. Banks of issue were not so common as to need special protection for themselves or the public against forgers and counterfeiters elsewhere than at home, and the great corporations, now so numerous and so important, established by public authority for the promotion of public enterprises, were almost unknown, and certainly they had not got to be extensive borrowers of money wherever it could be had at home or abroad on the faith of their *quasi* public securities. Now, however, the amount of national and corporate debt and of corporate property represented by bonds, certificates, notes, bills, and other forms of commercial securities, which are bought and sold in all the money markets of the world, both in and out of the country under whose authority they were created, is something enormous.

Such being the case, it is easy to see that the same principles

that developed, when it became necessary, the rule of national conduct which was intended to prevent, as far as might be, the counterfeiting of the money of one nation within the dominion of another, and which, in the opinion of so eminent a publicist as Vattel, could be applied to the foreign exchange of bankers, may, with just propriety, be extended to the protection of this more recent custom among bankers of dealing in foreign securities, whether national or corporate, which have been put out under the sanction of public authority at home, and sent abroad as the subjects of trade and commerce. And especially is this so of bank notes and bank bills issued under the authority of law, which, from their very nature, enter into and form part of the circulating medium of exchange — the money — of a country. Under such circumstances, every nation has not only the right to require the protection, as far as possible, of its own credit abroad against fraud, but the banks and other great commercial corporations, which have been created within its own jurisdiction for the advancement of the public good, may call on it to see that their interests are not neglected by a foreign government to whose dominion they have, in the lawful prosecution of their business, become to some extent subjected.

No nation can be more interested in this question than the United States. Their money is practically composed of treasury notes or certificates issued by themselves, or of bank bills issued by banks created under their authority and subject to their control. Their own securities, and those of the states, the cities, and the public corporations, whose interests abroad they alone have the power to guard against foreign national neglect, are found on sale in the principal money markets of Europe. If these securities, whether national, municipal, or corporate, are forged and counterfeited with impunity at the places where they are sold, it is easy to see that a great wrong will be done to the United States and their people. Any uncertainty about the genuineness of the security necessarily depreciates its value as a merchantable commodity, and against this international comity requires that national protection shall, as far as possible, be afforded. If there is neglect

in that, the United States may, with propriety, call on the proper government to provide for the punishment of such an offence, and thus secure the restraining influences of a fear of the consequences of wrong doing. A refusal may not, perhaps, furnish sufficient cause for war, but it would certainly give just ground of complaint, and thus disturb that harmony between the governments which each is bound to cultivate and promote.

But if the United States can require this of another, that other may require it of them, because international obligations are of necessity reciprocal in their nature. The right, if it exists at all, is given by the law of nations, and what is law for one is, under the same circumstances, law for the other. A right secured by the law of nations to a nation, or its people, is one the United States as the representatives of this nation are bound to protect. Consequently, a law which is necessary and proper to afford this protection is one that Congress may enact, because it is one that is needed to carry into execution a power conferred by the Constitution on the Government of the United States exclusively. There is no authority in the United States to require the passage and enforcement of such a law by the states. Therefore the United States must have the power to pass it and enforce it themselves, or be unable to perform a duty which they may owe to another nation, and which the law of nations has imposed on them as part of their international obligations. This, however, does not prevent a state from providing for the punishment of the same thing; for here, as in the case of counterfeiting the coin of the United States, the act may be an offence against the authority of a state as well as that of the United States.

Again, our own people may be dealers at home in the public or *quasi* public securities of a foreign government, or of foreign banks or corporations, brought here in the course of our commerce with foreign nations, or sent here from abroad for sale in the money markets of this country. As such they enter into and form part of the foreign commerce of the country. If such securities can be counterfeited here with impunity, our

own people may be made to suffer by a wrong done which affects a business that has been expressly placed by the Constitution under the protection of the government of the United States.

It remains only to consider those questions which present the point whether, in enacting a statute to define and punish an offence against the law of nations, it is necessary, in order "to define" the offence, that it be declared in the statute itself to be "an offence against the law of nations." This statute defines the offence, and if the thing made punishable is one which the United States are required by their international obligations to use due diligence to prevent, it is an offence against the law of nations. Such being the case, there is no more need of declaring in the statute that it is such an offence than there would be in any other criminal statute to declare that it was enacted to carry into execution any other particular power vested by the Constitution in the Government of the United States. Whether the offence as defined is an offence against the law of nations depends on the thing done, not on any declaration to that effect by Congress. As has already been seen, it was incumbent on the United States as a nation to use due diligence to prevent any injury to another nation or its people by counterfeiting its money, or its public or *quasi* public securities. This statute was enacted as a means to that end, that is to say, as a means of performing a duty which had been cast on the United States by the law of nations, and it was clearly appropriate legislation for that purpose. Upon its face, therefore, it defines an offence against the law of nations as clearly as if Congress had in express terms so declared. Criminal statutes passed for enforcing and preserving the neutral relations of the United States with other nations were passed by Congress at a very early date; June 5, 1794, c. 50, 1 Stat. 381; June 14, 1797, c. 1, 1 Stat. 520; March 3, 1817, c. 58, 3 Stat. 370; April 20, 1818, c. 88, 3 Stat. 447: and those now in force are found in Title LXVII of the Revised Statutes. These all rest on the same power of Congress that is here invoked, and it has never been supposed they were invalid because they did not expressly declare that the offences there defined were offences against the law of nations.

If there is anything more in the eleventh question certified than has been already disposed of in answering the others, it is too broad and indefinite for our consideration under the rules which have been long established regulating the practice on a certificate of division.

*All the questions certified, except the eleventh, are answered in the affirmative, and as to that, no special answer will be made.*