**UNITED STATES of America,**
**Appellee,**

v.

**William GROSH and Mario Garcia Kohly,**
**Appellants.**

**No. 324, Docket 29342.**

United States Court of Appeals
Second Circuit.

Argued Jan. 21, 1965.

Decided Feb. 26, 1965.

Certiorari Denied June 1, 1965.
See 85 S.Ct. 1767.

Charles J. Fanning, Asst. U. S. Atty. (Robert M. Morgenthau, U. S. Atty., for the Southern District of New York, New York City, Charles A. Stillman, Asst. U. S. Atty., of counsel), for appellee.

James A. Cardiello, New York City (Dodd, Cardiello & Blair, New York City, on the brief, Robert Morris, New York City, of counsel), for appellants.

Before MOORE, FRIENDLY and MARSHALL, Circuit Judges.

PER CURIAM.

Defendants William Grosh, an American, and Mario Garcia Kohly, a Cuban national, were indicted on one count for conspiring to violate 18 U.S.C.A. §§ 478, 479, 480 and 481, relating to the counterfeiting of foreign currency, and on one count for knowingly and without lawful authority possessing plates from which might be printed counterfeit notes of a foreign government, in violation of "Title 18, United States Code, Sections 481 and 2." After a jury trial before Judge Weinfeld, defendants were convicted on both counts and sentenced to concurrent terms of one year's imprisonment on each count.

Kohly claims to have been active in efforts to overthrow the incumbent Castro regime in Cuba, the government recognized by the United States. Grosh was his associate. They were engaged in a scheme to print counterfeit Cuban peso notes, some of which would be sold to Cuban exiles in this country, the rest to be dropped from the air into Cuba in an effort to undermine the Cuban economy. Arms for a potential invasion were to be purchased with the proceeds remaining from the sales to exiles after deduction of an amount adequate to cover costs and a profit to defendants and their accomplices. Needless to say, the Castro government had not authorized this operation; nor had the United States. Once the plates had been prepared, a printer would be needed. Defendants made the now unfortunate choice of selecting as their printer, Harris Martin, a Secret Service undercover agent, who was promised a nice profit to make up for his lack of the patriotic zeal which they claim motivated them. Defendants were arrested while passing the plates to Martin in the lobby of the Waldorf-Astoria.

Certainly no defense counsel would be likely to interpret the citation of the well-known section 2 as meaning section 482. Even if he did, however, there could be no prejudice because sec-

tion 2 (the general aiding and abetting section) need not even be charged, see Nye & Nissen v. United States, 168 F.2d 846, 855 (9th Cir. 1948), aff'd 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919 (1949); cf. United States v. Russo, 284 F.2d 539, 540 n. 1 (2d Cir. 1960). Preparation to meet any charges arising under section 482 (relating to counterfeiting bank notes or bills of a bank or corporation of a foreign country) as well as section 481 could not have been prejudicial. It might be another story if, thinking "2" meant only section 2, defendants were actually tried for violation of section 482. But they were not.

Similarly lacking in merit is the attack on Judge Weinfeld's conduct of the trial. All of the claims relate to matters within the trial judge's broad discretion, and there has been no showing that it was abused.

 Defendants' remaining claim is that they did not "without lawful authority * * * possess a plate] from which * * * may be printed any counterfeit note * * * of any foreign government * * *," 18 U.S.C.A. § 481, because they possessed the plates and would have been printing notes with the authority of a Cuban government-in-exile, albeit a self-constituted one. In disposing of this claim we need not stray far from the text of the statute. It is clear that the plates were to be used to print notes purporting to be the currency of the present Cuban government. Else, how could the notes accomplish their subversive function and how could they be salable? That government had not given its authority. Where there is a recognized foreign government—surely included in "any foreign government"—whose notes are intended to be printed without that government's authority, we cannot doubt that the clear meaning of the statute has been met. Whether or not the present Cuban government is approved of, the purposes of the statute are served by providing this measure of protection for Cuban currency, just as with any other country's currency. As stated in United States v. Arjona, 120 U.S. 479,

7 S.Ct. 628, 30 L.Ed. 728 (1887) with respect to the predecessor of section 481, in recognition of the reciprocal obligations of international relations and intercourse among nations

> "it was incumbent on the United States as a nation to use due diligence to prevent any injury to another nation or its people by counterfeiting its money, or its public or *quasi* public securities. This statute was enacted as a means to that end * * *" Id. at 488, 7 S.Ct. at 632.

Moreover, "if such securities can be counterfeited here with impunity, our own people may be made to suffer * * *" Id. at 487–88, 7 S.Ct. at 632.

Affirmed.