BROWN, Circuit Judge,
concurring in the judgment in part and dissenting in part:
Over five years ago, Ali Hamza Ahmad Suliman al Bahlul was convicted of conspiracy, solicitation, and providing material support for terrorism. Since that time, the government has been defending the conviction, first before the Court of Military Commission Review and now before this court. In this appeal, the government seeks clarification of the prosecutorial tools it can employ in the war on terror. While I concur in the court’s judgment affirming Bahlul’s conspiracy conviction and vacating the solicitation and material support convictions, I cannot agree with the way the court reaches that result. By reviewing Bahlul’s claims under a plain error standard, the court minimizes the value its opinion might provide to the government in future prosecutions. And by remanding residual issues to a panel, the court delays resolution of Bahlul’s case.
I would definitively answer the important questions raised by Bahlul’s appeal, reviewing his ex post facto arguments under a de novo standard. I would also affirm Congress’s power under the Define and Punish Clause to make certain offenses, including conspiracy, triable by military commission. This legal saga has endured long enough, and we should take this opportunity to resolve important legal questions that have arisen from the war on terror.
I
The opinion of the court provides insightful legal and historical background and, in certain areas, well-reasoned analysis. The separate opinions of Judges Henderson and Kavanaugh afford additional insight. There is much in those opinions with which I wholeheartedly agree. But although I concur in the court’s judgment, I would reach its conclusion through a slightly different path. In this section, I draw on the compelling analysis of my colleagues to explain briefly how I would dispose of Bahlul’s challenges. In the following sections, which contain the analytical bulk of my concurrence, I address three issues that I feel are not adequately covered by the other opinions: the applicability of ex post facto principles to Bahlul’s convictions, Bahlul’s challenge to Congress’s power under the Define and Punish Clause, and the court’s decision to remand remaining issues to a panel of this court.
I begin by noting the areas where I agree with my colleagues. First, for the reasons expressed by Judge Kavanaugh, I would review Bahlul’s Ex Post Facto Clause and retroactivity arguments under a de novo standard. See Opinion of Judge Kavanaugh (Kavanaugh Op.) 78-80; see also Opinion of Judge Rogers Part II.A. Bahlul asked the Military Judge presiding over his trial a “legal question” that, although not a model of clarity, was sufficient to preserve those arguments: “Does the law here start from before, during, or after?” Supp.App. 37. Furthermore, Rules 905 and 907 of the Rules of Military Commissions make jurisdictional challenges—including Bahlul’s—not subject to forfeiture.
*52 Second, I agree with the court that the Military Commissions Act (MCA) of 2006 unambiguously authorizes retroactive prosecution for all the crimes enumerated in that statute. See Op. Part III. Both the text of the Act—including in particular 10 U.S.C. § 948d(a) (2006) (granting military commissions jurisdiction over offenses “committed ... before, on, or after September 11, 2001”)—and the context of the judicial-legislative dialogue in which the Act was passed require this conclusion.
Third, like the court, I would accept, for the purposes of this case only, the government’s concession that the Ex Post Facto Clause provides its protection to aliens detained at Guantanamo. See Op. 17-18. However, I doubt the correctness of the government’s concession. If our review of the question were de novo, I would, like Judge Henderson, apply the longstanding precedents of the Supreme Court and this court and conclude that the Ex Post Facto Clause does not apply to Bahlul or other aliens at Guantanamo. See Opinion of Judge Henderson.
Fourth, I would reject Bahlul’s Ex Post Facto Clause challenge as it concerns his conspiracy conviction. As Judge Kava-naugh explains, prior to 2006, the “law of war” provision of 10 U.S.C. § 821 (Article 21 of the Uniform Code of Military Justice) preserved the jurisdiction of military commissions to try offenses that (1) were codified in federal statutes and explicitly made triable by military commission, (2) were recognized by the international law of war, or (3) were, according to domestic tradition and practice, triable by military commission. See Kavanaugh Op. 65-68; of. Op. 22-24 (holding such a conclusion is not plainly erroneous). Furthermore, as the Lincoln conspirators’ cases, Quirin, Colepaugh, and the Korean War decisions demonstrate, domestic practice traditionally treated conspiracy as an offense triable by military commission. See Kavanaugh Op. 68-70; cf. Op. 24-26 (reaching similar conclusion under a plain error standard). Because conspiracy was an offense triable by military commission before the 2006 MCA, Bahlul’s prosecution for that offense did not violate the Ex Post Facto Clause.[1]
Fifth, I fully agree with the court’s discussion of material support and solicitation and its conclusion that those offenses were not historically triable by military commission. See Op. Part IV.B-C. Thus, I join the court’s decision to vacate Bahlul’s convictions for those offenses.
II
As noted above, if not for the government’s concession, I would hold that, as an alien detained outside the sovereign territory of the United States, Bahlul is not entitled to the protections otherwise afforded by the Ex Post Facto Clause. However, despite my doubts about the extraterritorial applicability of the Clause, I do not doubt that its underlying principles apply to detainees at Guantanamo. The *53 legal principle nullum crimen sine lege, found in the common law and international law, constrains the power of the United States to prosecute wherever it may do so. But, even if there were not a long history of conspiracy charges being tried by military commission, invocation of the ex post facto principle alone could not help Bahlul or similarly situated detainees. As the International Military Tribunal convened at Nuremberg in the aftermath of World War II thoughtfully observed, “the maxim nullum crimen sine lege is not a limitation of sovereignty, but is in general a principle of justice.” Judgment of October 1, 1946, 1 International Military Tribunal, TRial OF THE MAJOR WAR CRIMINALS (IMT) 171, 219 (1947).
During the proceedings of the International Military Tribunal, the defendants, who were charged with conspiring to wage aggressive war, complained that ex post facto punishment was abhorrent to the law of all civilized nations and that no sovereign power had made aggressive war a crime, no statute defined aggressive war, no penalty had been fixed for its commission, and no court had been created to try and punish offenders at the time the acts were committed. Nevertheless, the Tribunal recognized that its expression of the international law was “itself a contribution to international law” and, in setting up the Tribunal, several nations had done together what any nation had a right to do singly. Id. at 218. The Tribunal stated that “[t]o assert that it is unjust to punish those who in defiance of treaties and assurances have attacked neighboring states without warning is obviously untrue, for in such circumstances the attacker must know that he is doing wrong, and so far from it being unjust to punish him, it would be unjust if his wrong were allowed to go unpunished.” Id. at 219.
In the case of the- terrorist attacks of September 11, involving the murder of thousands of civilians, the attackers knew the civilized world would condemn their actions. Bahlul was fully aware of how the world would view his complicity in a moral evil, and “so far from it being unjust to punish him, it would be unjust if his wrong were allowed to go unpunished.” See id.
Ill
Bahlul argues Congress does not have the power under the Define and Punish Clause to make triable by military commission those offenses not proscribed by the international law of war. The court remands this issue to the panel. But the issue was fully briefed and argued before the en banc court and, for the reasons explained below, see infra Part IV, I think we should take the opportunity to resolve Bahlul’s challenge now.
Judge Kavanaugh would resolve this challenge by holding that Congress’s authority to establish military commissions derives not only from the Define and Punish Clause, but from Congress’s war powers more generally, including those originating in the Declare War and Necessary and Proper Clauses of Article I, Section 8. See Kavanaugh Op. Part II. Judge Kava-naugh notes that the war powers clauses do not refer to international law and are not defined or constrained by that law. While I agree with Judge Kavanaugh’s broad characterization of Congress’s war powers, I find his resolution of Bahlul’s claim incomplete. By looking to Congress’s authority under the war powers clauses, Judge Kavanaugh leaves unresolved the argument that Congress’s power under the Define and Punish Clause is strictly constrained by international law. I would resolve Bahlul’s challenge to Congress’s Define and Punish Clause powers on Define and Punish Clause grounds *54 alone, holding that the Clause gives Congress far greater powers than Bahlul acknowledges.[2]
Any discussion of the Define and Punish Clause must take proper account of two separate but related points. First, in drafting the Clause, the Framers were distinctly aware of the undefined and adaptable nature of international law. They also recognized the concomitant flexibility inherent in that law. And they understood that the United States could, and indeed should, make use of that flexibility to advance its own national security interests. That is, the Framers intended the United States—like other nations—to act in its own self-interest, albeit within the flexible constraints of international law. Second, the Framers deliberately placed the responsibility and prerogative to interpret and define international law with Congress—a political branch—rather than with the judiciary. This second point is related to the first and to some extent demonstrates its truth: If the Framers had intended the country to be strictly constrained by narrowly-interpreted international law, it would have made more sense to place the power to interpret that law with the judiciary—the legal branch expert in such tasks. But, instead, the Framers placed the power with Congress, intending that Congress would interpret and define international law in a more flexible way that serves the country’s self-interest, but still remains compatible with international norms. The Framers recognized the discretion that must necessarily be exercised in defining international law, and entrusted that discretion to Congress. The judiciary was given only very limited power to review Congress’s choices in defining and punishing violations of international law, and must exhibit tremendous deference to the legislature’s choices in this area.
With respect to the two principles described above, Congress’s decision to make conspiracy an offense triable by military commission provides an excellent example of the flexibility inherent in international law and ably demonstrates congressional prerogatives.
A
1
The history behind the Define and Punish Clause supports an expansive reading of Congress’s power under the Clause. Both the drafters of the Constitution and their eighteenth-century audience would have had more than a passing familiarity with Blackstone and Locke—and, perhaps, Vattel, Grotius, and other theorists— whose writings not only suggest the law of nations was the special domain of the executive and legislative branches, not the judiciary, but also tend to emphasize the protean quality of international law. See The FedeRalist No. 42, at 260 (James Madison) (Clinton Rossiter ed., 1961) (referring to the Define and Punish Clause as one of the “class of powers, lodged in the general government ... which regulate the intercourse with foreign nations”); BernaRD Bailyn, The Ideologioal Origins of the Amerioan Revolution 27-31 (1967); Forrest McDonald, Novus Ordo Seclorum: The Intellectual Origins of the Constitution 7, 60, 80 (1985).
The Framers were committed to a national government agile enough to avoid foreign entanglements and strong enough to deter aggression. In part, it was the country’s weakness in the face of decades *55 of depredations by pirates in the pay of the despots of the Barbary States that added urgency to the constitutional convention. In 1785, when emissaries Thomas Jefferson and John Adams sought a diplomatic solution to America’s piracy problems, Abd al-Rahman, the representative of Tripoli’s pasha, coolly reiterated his nearly one-million-dollar ransom demand, and replied to their peace overtures in terms that would be familiar to contemporary Americans. He told the emissaries: “all Nations who should not have acknowledged [the Muslims’] authority were sinners, that it was [Islam’s] right and duty to make war upon whoever they could find and to make Slaves of all they could take as Prisoners, and that every Mussulman who should be slain in battle was sure to go to Paradise.” Michael B. OREN, Power, Faith, anb Fantasy: America in the Middle East, 1776 to the Present 26-27 (2007). And the fledgling U.S. Republic continued to be victimized, paying as much as a tenth of the national treasury to ransom its citizens and its ships until well into the nineteenth century when President Jefferson finally had a navy equal to the task of freeing some shipping lanes. It is inconceivable that the drafters, cognizant of this unhappy history and understandably wary of the agendas and motives of European powers, would have intended a reference to the law of nations to limit America’s ability to defend its sovereignty and its citizens to only such actions as some international consortium sanctioned. Cf. Notes op Debates in the Federal Convention of 1787, Reported by James Madison 637, (W.W. Norton & Co.1987) (debate on the Define and Punish Clause); The Federalist Nos. 16, 66, 68 (Alexander Hamilton).
More importantly, the Framers clearly understood that parity among sovereign states is an aspect of power. Customary international law is often just another name for enlightened self-interest. The philosophical and cultural environment in which the Constitution developed was permeated by the premise of natural law at the core of the Constitution. The drafters saw nothing odd in the idea that nation-states could commit wrongs or that wronged states could punish bad behavior, provided they were strong enough to do so. America is not just the passive subject of the law of nations; it is a participant of and contributor to it. No one doubts the right of all nations “to resort to forcible means for the purpose of repressing any one particular nation who openly violates the laws of the society which Nature has established between them, or who directly attacks the welfare and safety of that society.” Emmerioh de Vattel, The Law of Nations, Preliminaries § 22, at 61 (photo, reprint 2005) (1854). Punishment contemplated a spectrum of coercive means up to and including war. Thus, Congress’s power to punish offenses against the law of nations comprehended a power to invoke a range of coercive means to preserve and maintain the law of nations. These sentiments are also part of the organic law of nations. See J. Andrew Kent, Congress’s Under-Appreciated Power to Define and Punish Offenses Against the Law of Nations, 85 Tex. L.Rev. 843, 927 (2007) (“The collective enforcement of the law of nations envisioned by Vattel, Grotius, and others included the power to punish through warfare pirates, terrorists, and other sub-state violent groups.”); see also Vattel, The Law of Nations, supra, bk. Ill § 34, at 407 (“[P]rofessed assassins and incendiaries are guilty, not only towards the particular victims of their nefarious deeds, but also towards the state, which therefore proclaims them public enemies. Ml nations have a right to join in a confederacy for the purpose of punishing and even exterminating those savage nations.”).
*56 Moreover, the law of nations includes not only what is mandated, such as compliance with self-executing treaty obligations, but also what is permitted. See, e.g., Hugo GROtius, The Law of War and Peace, bk. 2, ch. 20, § 40, 226-27 (Walter J. Black 1949) (1625) (permitting nations to wage war not only for wrongs committed against themselves, but also for wrongs against nature). As one drafter explained: “The law of nature, when applied to states or political societies, receives a new name, that of the law of nations.” James Wilson, of the Law of Nations, in 1 The Worics of James Wilson 148 (Robert Green McCloskey, ed., Harvard Univ. Press 1967) (1804).
Commentaries and treatises attempted to summarize how natural rights applied to relations between nations. In fact, the full title of Vattel’s work is The Law of Nations Or, Principles of the Law of Nature, Applied to the Conduct and Affairs of Nations and Sovereigns. Thus, such treatises acknowledged the undisputed right of each nation to preserve its national existence, to punish the violation of its laws, and to defend its polity and protect its property, and condemned unwarranted violence, conquest, and lawlessness. Vat-tel distinguishes the Positive law of nations (based on treaties, convention, and custom) from the Natural or Necessary law of nations. “As to the rights introduced by Treaties or by Custom, there is no room to apprehend that any one will confound them with the Natural law of nations.” Vattel, The Law of Nations, supra, Preliminaries § 27, at 63. To the extent these laws originated as precepts of reason derived from the law of nature, it makes sense that the law can change in response to the exigencies of new species of violence.
The few early cases interpreting the Define and Punish Clause acknowledged the flexibility inherent in international norms and deference to the exclusive congressional prerogatives the clause prescribes. In United States v. Smith, 18 U.S. (5 Wheat.) 158, 5 L.Ed. 57 (1820), Justice Story noted offenses against the law of nations “cannot, with any accuracy, be said to be completely ascertained and defined in any public code recognised by the common consent of nations.” Id. at 159. He acknowledged that Congress could provide its own enumeration of offenses or leave the definition, “without inconvenience to the law of nations.” Id. at 158.
In United States v. Arjona, 120 U.S. 479, 487-88, 7 S.Ct. 628, 30 L.Ed. 728 (1887), Chief Justice Waite held that Congress may punish an individual who counterfeits another nation’s money because the law of nations generally requires prevention of a wrong within one nation’s dominion against a nation with whom it is at peace. Thus, Congress could define and punish counterfeiting as a violation of the law of nations even though counterfeiting was not a widely recognized offense like piracy. And there are other early indications from the Supreme Court that no mandate in the Constitution requires Congress to follow strictly the law of nations. See, e.g., Ware v. Hylton, 3 U.S. (3 Dall.) 199, 224, 1 L.Ed. 568 (1796) (Chase, J.) (“Suppose a general right to confiscate British property, is admitted to be in Congress, and Congress had confiscated all British property within the United States, including private debts: would it be permitted to contend in any court of the United States, that Congress had no power to confiscate such debts, by the modern law of nations? If the right is conceded to be in Congress, it necessarily follows, that she is the judge of the exercise of the right, as to the extent, mode, and manner.”); id. at 266 (Iredell, J.) (noting “[t]he power ... of the Legislature of the Union [is limited] by the Constitution of the Union” but acknowledging that when the legislature acts *57 within a discretion expressly confided by the Constitution its enactments are “in all eases obligatory”).
As Justice Story observed in Smith, the international law’s resistance to facile formulas led the Framers to entrust Congress with the “power to define” the laws of nations. 18 U.S. at 159. The range and fluidity of international law, the distinctive needs of each nation-state, and dangers of faction to a system that relies on myriad sources establishing a consensus of nation-state opinion and practice increased the necessity for carving out a zone of deference for Congress’s authority.
The Framers labored to separate law from politics because they knew that without that boundary, everything would be politics. They (wisely) perceived that law is (mostly) clear and categorical while politics—statecraft, diplomacy, warfare—is murky, a realm Justice Jackson evocatively dubbed the “zone of twilight.” Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 637, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring). The structure of the Constitution echoes this rhetorical divide. On the political side, the Define and Punish Clause is included in Article I, Section 8, grouped with the other enumerated war powers such- as declaring war, raising armies, maintaining a navy, and issuing letters of marque and reprisal. On the legal side, the Ex Post Facto Clause in Section 9 is part of a list of prohibitions limiting and defining the power of the national government over sovereign states and the polity newly subject to national power. The single exception to this categorization may be the prohibition on suspension of the Writ of Habeas Corpus, and that limitation can be overridden when it threatens the defense powers authorized by Section 8. Cf. Robert J. Pushaw, Jr., The Inherent Powers of Federal Courts and the Structural Constitution, 86 Iowa L.Rev. 735, 744-47 (2001); Martin H. Redish, Federal Common Law, Political Legitimacy, and the Interpretive Process: An “Institutionalist” Perspective, 83 Nw. U.L.Rev. 761, 765 (1989).
Thus, both the history and the placement of the clause demonstrate the power to define and punish was intended to give Congress flexibility in protecting national security, not to constrain the country’s ability to act by reference to international norms. They also suggest the power is a unique legislative power separate from traditional federal court jurisdiction.
2
More modern authorities demonstrate that international law has remained as flexible a concept today as it was in 1789. Like all common law, the law of war is part of an evolving process. As the International Military Tribunal at Nuremberg explained:
[Ijnternational law is not the product of an international legislature, and ... international agreements ... have to deal with general principles of law.... The law of war is to be found not only in treaties, but in the customs and practices of states which gradually obtained universal recognition, and from the general principles of justice applied by jurists and practised by military courts. This law is not static, but a continual adaptation follows the needs of a changing world.
1IMT 221.
The international law of war is an evolving effort to protect civilians from the horrors of total war. Weaponry and modes of warfare change; human nature does not. Customary understandings about the international law of war are revised to account for the impact of bigger armies, more lethal weapons, and the speed and scope of belligerents’ response. Thus, the *58 Lieber Code drafted during our Civil War gave way to the 1868 St. Petersburg Declaration, which stated that “the progress of civilization should have the effect of alleviating as much as possible the calamities of war.” Declaration Renouncing the Use, in Time of War, of Certain Explosive Projectiles (St. Petersburg Nov. 29/Dec. 11, 1868). The Hague Convention of 1899 included the so-called Martens Clause, still applicable today, which declared that except where otherwise provided within the specific regulations of the Convention, “populations and belligerents remain under the protection and empire of the principles of international law, as they result from the usages established between civilized nations, from the laws of humanity, and the requirements of the public conscience.” Convention with Respect to the Laws and Customs of War on Land (Hague II), pmbl., July 29, 1899. Thus, the international community continues to recognize the protean nature of the law of war, and recognizes that the law may and should develop to address the demands of contemporary warfare.
What is perhaps an ironic example of the fluid development of the international law of war can be seen in Hamdan v. Rumsfeld (Hamdan I), 548 U.S. 557, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006). The 1907 Hague Convention and the Geneva Conventions which followed it in 1929 and 1949 sought to provide a bright line of demarcation between combatants who could be harmed and noncombatants who could not be targeted. Reciprocity was the key to this protective regime. Combatants had to act under a fixed command structure, wear insignia that clearly identified them as combatants, and refrain from targeting or killing civilians. In 1977, the International Committee of the Red Cross, egged on by non-aligned nations and those within the sway of the former Soviet Union, introduced additional protocols that broke away from the reciprocity norms, allowing parties engaged in noneonventional warfare to refuse to wear distinguishing insignia or carry arms openly until immediately before an attack, and allowing non-state actors “fighting against colonial domination and alien occupation and against racist regimes” to assert lawful authority for their efforts. Protocol Additional to the Geneva Conventions of 12 August 1949, art. 1, 44, June 8, 1977. Leading states, including the United States, declined to ratify these protocols, fearing they would protect terrorists at the expense of civilians and allow insurgents to claim status as prisoners of war.
However, in Hamdan I, Justice Stevens broke apart these carefully crafted understandings. He concluded that Salim Ham-dan was entitled to the protections of Article 3 of the Geneva Conventions (Common Article 3) without determining either the nature of the conflict or the status of the combatant, and without deciding whether extending the Conventions’ protections to terrorists, anarchists, or brigands violated the expectation of the parties. Even Hamdan /’s fans lament its “incomplete and at times cursory analysis of critical issues involving the Geneva Conventions’ scope and the substantive protections the Conventions provide.” Michael W. Lewis, International Myopia: Hamdan’s Shortcut to ‘Victory”, 42 U. Rich. L.Rev. 687, 689 (2008). They note “a certain clumsiness of application and a dearth of analytical rigor.” Fionnuala Ni Aoláin, Hamdan and Common Article S: Did the Supreme Court Get It Right?, 91 Minn. L.Rev. 1523, 1524 (2007).
As Justice Stevens reconstructed Common Article 3, plucking bits and pieces out of other articles to suit his narrative, members of organizations that routinely target civilians and exploit perfidious circumstances were given the ability to argue for *59 protections previously available only to combatants who followed the rules. Detainees were quick to take advantage of these opportunities. In Al Warafi v. Obama, 716 F.3d 627 (D.C.Cir.2013), a member of the Taliban claimed protection as a medic under Article 24 of the Geneva Convention despite the fact that he did not have the mandatory insignia or identification the Convention requires. Indeed, Al Warafi was captured carrying a weapon and had previously served in a combat role. In Al-Bihani v. Obama, 590 F.3d 866, 871, 874 (D.C.Cir.2010), a detained member of al Qaeda argued he must be considered a civilian and released because he did not belong to an official state military and had not had the opportunity to commit a direct hostile act such as firing a weapon in combat. Thus, belligerents who did not play by the rules of international law sought to claim the protections of that law. It is true that the purpose of the Geneva Conventions is to protect human rights during wartime—even the rights of combatants who flout the Conventions— but it is hard to “reconcile this purpose with the concept that a group which targets civilians may benefit from that very behavior, by being afforded all the rights of the civilians it targets.” Lewis, International Myopia, supra, at 714-15.
In Hamdan I, the plurality seized upon the evolving nature of the international law of war to extend the protections of that law to nonconventional belligerents. But Bahlul argues this court should refuse to allow the government to leverage that evolving nature to deter those belligerents—an approach that would handcuff the United States to a one-way ratchet. Instead, we should recognize that the international law of war also adapts in a way that allows states to oppose nonconven-tional combatants and protect themselves from terrorists. Even more importantly, however, we must acknowledge that the development of international law is a task entrusted by the Framers to the legislative branch. The judiciary must give Congress extraordinary deference when it acts under its Define and Punish Clause powers.
B
Under the approach to the Define and Punish Clause outlined above, which gives proper regard to the dual principles of flexibility and deference, the conspiracy charge against Bahlul should stand. Even if the offense of conspiracy was not recognized under international law in 2001 by the same labels used by Congress in the 2006 Military Commissions Act, the substance is similar. Indeed, it is to be expected that international law, which was largely created by jurists trained in the civil law and which only more recently has begun to absorb common law ideas and institutions, differs formally from our own common law tradition. See Colin B. Picker, International Law’s Mixed Heritage: A Common/Civil Law Jurisdiction, 41 Vand. J. TráNsnat’l L. 1083, 1104-06 (2008). But that does not mean that when Congress decides to implement international law domestically it cannot adapt that law to fit within our common law institutions. Such adaptation is appropriate both because of the evolving nature of international law and the necessities of implementing international law in an established domestic legal system. International law recognizes analogues to conspiracy and other inchoate offenses.
In civil law countries, conspiracy is generally treated as a mode of liability requiring a completed crime. Peter Margulies, Defining, Punishing, and Membership in the Community of Nations: Material Support and Conspiracy Charges in Military Commissions, 36 FoRdham Int’l L.J. 1, 84 (2013). In the United States and *60 other common law countries, however, conspiracy is treated as a separate offense, requiring only an agreement and, in some instances, an overt act furthering the agreement. Id.; see, e.g., 18 U.S.C. § 371 (conspiracy to defraud the United States). International law has adopted something of a hybrid approach, recognizing conspiracy as a stand-alone offense for some of the most serious war crimes—namely, genocide and waging aggressive war—and using conspiracy as a inode of establishing liability for all other international law offenses.
With the exceptions of aggressive war and genocide, international law does not recognize inchoate acts as stand-alone offenses, but as modes of liability. For instance, the Rome Statute recognizes that a person will be criminally responsible for a crime if that person “[i]n any ... way contributes to the commission or attempted commission of such a crime by a group of persons acting with a common purpose.” Rome Statute of the International Criminal Court, art. 25, § 3(d) (2002); see also id. § 3(b) (a person shall be guilty of an offense if he “[o]rders, solicits or induces the commission of such a crime which in fact occurs or is attempted.”); id. § 3(c) (a person shall be guilty of an offense if he “aids, abets or otherwise assists in its commission or its attempted commission, including providing the means for its commission.”). The difference between inchoate offenses under domestic criminal law and the modes of liability under international law is that international law requires that for someone to be convicted of conspiracy, solicitation, or material support, the substantive offense must have been completed or attempted. But in defining the crime of conspiracy as an inchoate offense, Congress exercised precisely the kind of discretion and flexibility the Define and Punish Clause envisions. Congress adapted recognized international law to fit the country’s particular needs and legal system.[3]
It should be of no consequence that the form or name of the charges was different from what might be charged in the International Criminal Court or another international war tribunal. Whether the prosecutor demonstrates a conspiracy to obtain a conviction on a substantive offense, or establishes a conspiracy to commit a completed act as a stand-alone offense is a matter of form that springs from the differences between common law and civil law institutions. In matching military commission charges to international law offenses, we should adopt a functional approach, looking at the conduct involved rather than the label given to that conduct. It would be senseless to limit military commissions’ ability to try terrorists because the government has not adopted the forms and names used by international tribunals. Under a functional approach, Bahlul’s con *61 viction for conspiracy is sufficiently grounded in international law.
Furthermore, recent international war crimes tribunals have recognized as independent offenses conspiracy to commit genocide and conspiracy to wage aggressive war. See 1 IMT 224-26 (recognizing the crime of conspiracy to wage aggressive war but not recognizing conspiracy to commit war crimes and crimes against humanity because the latter was not defined as a separate crime in the Tribunal’s charter); Updated Statute of the International Criminal Tribunal for the Former Yugoslavia, art. 4 (2009) (making punishable “conspiracy to commit genocide” as well as incitement or attempt to commit genocide and complicity in genocide); Statute, International Criminal Tribunal for Rwanda, art. 2 (2010) (same); Convention on the Prevention and Punishment of the Crime of Genocide, art. 3 (1948) (same). These offenses are the progeny of particular conflicts, created to address new and previously unimaginable evils. Yet despite the innovative and post hoc nature of these particular conspiracy prosecutions, there was little if any protest that they violated ex post facto principles—the abhorrent nature of the offenses vitiated any such “justice” arguments. Similarly, it may be the time has come for international law to recognize the offense of conspiracy to commit acts of terrorism. Terrorism may be the global security challenge of the 21st Century, just like aggressive war was in the early 20th Century and genocide was in the half century following World War II. Perhaps the United States should be a leader in this area—a leader in international law commensurate with its status as a military leader in the war on terror— recognizing the offense of conspiracy to commit acts of terrorism. These are not questions for the judiciary, but rather for the legislature to answer. And Congress did so with the MCA, broadly construing international law to include the offense of conspiracy.
C
The Framers and subsequent courts recognized that to define the law of nations, Congress required a zone of deference. Without a measure of deference, legislative fear of second-guessing would hobble Congress’s power under the Define and Punish Clause, leaving the nation subject to the fate Madison depicted for most previous democratic experiments: “short in their lives ... [and] violent in their deaths.” The FedeRalist No. 10, supra, at 76 (James Madison). Contemporary international practice exhibits the same kind of practical deference to permit individual states to assess their own obligations. The principle of complementarity requires international tribunals to accord deference to state investigations and recognizes that what is mandated still leaves room for what is merely permissive.
Hamdan I’s plurality had no trouble extending Common Article 3 to members of organizations like al Qaeda. As noted, by stretching Common Article 3 to meet what it clearly perceived as a new exigency, the Court participated in the law’s evolution. Thus, courts seem permitted to interpret international conventions to allow the humanitarian aspect of the law to evolve virtually instantaneously. We cannot, on the other side of the equation, deny the political branches the ability to respond to novel threats no matter how destructive, and leave the nation at the mercy of an international consensus and subject to the whims of hostile factions who could prevent agreement or promote harmful agendas. See, e.g., Protocol Additional to the Geneva Conventions of 12 August 1949, June 8, 1977. This cannot be the logical import of arguing that the *62 law of war is the law of nations. It would make the Constitution a suicide pact; and the Define and Punish Clause had just the opposite purpose. For international law to form a workable system, states need a zone of deference. “Exercising judgment within this zone, states could refine approaches that were broadly consistent with established norms and also fostered global compliance.” Margulies, Defining, Punishing, and Membership in the Community of Nations, supra, at 16; cf. New State Ice Co. v. Liebmann, 285 U.S. 262, 311, 52 S.Ct. 371, 76 L.Ed. 747 (1932) (Brandeis, J., dissenting) (advocating deference to states, which serve as laboratories of democracy).
Of course, deference does not mean there are no limits. We are always subject to the limits which restrain any regime premised on natural law and dedicated to the protection of natural rights. This is likely what the international community meant with the Martens Clause’s reference to the “principles of international law” resulting from “the laws of humanity[] and the requirements of the public conscience.” Hague II, pmbl., July 29, 1899. But a one-sided rigidity imposed on an inherently evolutionary international law does not do justice, it thwarts it.
Congress’s determination that conspiracy is an offense against the law of nations constitutes a reasonable interpretation of international law and is fully consistent with that law. Therefore, the judiciary is bound to uphold Congress’s exercise of authority under the Define and Punish Clause.
IV
Finally, I dissent with regard to the court’s remand of residual issues to a panel of this court. Bahlul’s appeal has been before this court nearly three years, and the court’s decision ensures it will remain here at least another term. Bahlul’s jury trial, equal protection, and freedom of speech challenges are clearly meritless. I would deny them all because Bahlul, as an alien located outside the territorial United States, is not entitled to the protections of the constitutional provisions he invokes, and, alternatively, because his claims lack merit for the reasons stated by Judge Kavanaugh. See Kavanaugh Op. Parts III, IV, and V. However, to the extent the court was not ready to decide these challenges, I would have asked the parties for supplemental briefing so we could do so.
More problematic, however, is that by reviewing Bahlul’s retroactivity arguments under the plain error standard, the court disposes of this case without providing the government clear guidance for prosecuting the remaining detainees at Guantanamo. Thus, it may be many years before the government receives a definitive answer on whether it can charge the September 11 perpetrators with conspiracy, or whether Congress has the power to make such an offense triable by military commission even prospectively. The ability to charge conspiracy is an important prosecutorial tool in the war on terror, where it can often be difficult for the government to procure evidence directly connecting leaders of militant groups with specific terror attacks.
The United States is engaged in a war on terrorism. As the various iterations of Hamdan and this case demonstrate, the Executive Branch needs concrete guidance as to how it can proceed with its prosecution of the September 11 conspirators and other detainees. Bahlul was first charged before a military commission ten years ago. Today, this court again leaves the government without any definitive answers. The court does not express respect to the coordinate branches of government by further delaying the executive’s prose- *63 cutorial efforts and thwarting the legislative’s expressed preference that detainees be tried by military commission. I would resolve now the exceedingly important questions presented in this case.
For these reasons, I would affirm Bah-lul’s conspiracy conviction and vacate his material support for terrorism and solicitation convictions. I would remand to the Court of Military Commission Review for it to address the consequences of our decision for Bahlul’s life sentence.

. In upholding Bahlul’s conspiracy conviction, I would not rely on 18 U.S.C. § 2332(b). Indeed, by relying on Olano’s fourth prong, the court practically concedes that the existence of the conspiracy provision in Title 18 would not save Bahlul’s conviction if not for the court’s application of a plain error standard. See Op. 20-22. I am also reluctant to rely on that provision, however, because of the significant procedural differences between criminal prosecutions in Article III civilian courts and prosecutions before military commissions. The parties have not fully briefed the issue, and I would be reluctant without such briefing to hold that a law retroactively transferring jurisdiction to try an offense from an Article III court to a military commission does not violate the Ex Post Facto Clause. Because the court utilizes a plain error standard, the court also does not fully embrace this novel and potentially far-reaching result.

. Judge Kavanaugh’s reliance on the war powers clauses leaves unresolved questions such as whether the government may try before a military commission members of a terrorist organization with which the United States is not engaged in active hostilities.

. Even under the international law standard requiring a completed offense, Bahlul was properly convicted. The conspiracy charge alleges Bahlul conspired to commit various substantive offenses, including murder of protected persons, attacking civilians and civilian objects, murder in violation of the law of war, destruction of property in violation of the law of war, terrorism, and providing material support for terrorism. App. 120. The charge alleges Bahlul committed eleven overt acts in furtherance of that conspiracy. Among other overt acts, the military commission found Bahlul had prepared martyr wills "in preparation for the acts of terrorism perpetrated by ... Mohamed Atta, Ziad al Jarrah and others at various locations in the United States on September 11, 2001” and "researched the economic effect of the September 11, 2001 attacks on the United States.” App. 122-23. Thus, the military commission verdict incorporates the finding that Bahlul's co-conspirators completed international law offenses-namely, the terrorist attacks of September 11. See Findings Worksheet, App. 130, 133.