MILLETT, Circuit Judge,
concurring:
“[T]here is no liberty if the power of judging be not separated from the Legislative and Executive powers.” The Federalist No. 78, at 425 (Alexander Hamilton) (E.H. Scott ed. 1898) (citation omitted). Under our system of. separated ..powers, that means that the Judicial Branch bears both distinct responsibilities and distinct constraints. In particular, the Judicial Branch must declare and enforce the Constitution’s limitations against the actions of the Political Branches in cases when that is necessary. And we must not do so when it is not necessary. “After all, a longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.”[1]
*775 Pursuant to the Military Commissions Act of 2006 (“2006 Act”), Pub. L. No. 109-366, 120 Stat. 2600, a military commission found petitioner Hamza Ahmad Suliman al Bahlul guilty of conspiracy to violate the law of war, in violation of 10 U.S.C. § 950v(b)(28). The parties framed for our review the important constitutional questions of whether a conviction for inchoate conspiracy by an Article I military commission either exceeds Congress’s legislative authority under Article I or violates Article Ill’s assignment of the judicial power to the federal courts.
I would decline to resolve those constitutional questions because they are not directly presented by this case. First, Bahlul forfeited those challenges by failing to raise them before the military commission, making plain-error review appropriate.
Second, whatever broad constitutional issues may lurk within the 2006 Act, Bah-lul challenges only his judgment of conviction, and thus the application of the 2006 Act’s conspiracy provision to him in this prosecution. See. Oral Arg. Tr. 6; Pet. Br. 57. And the conspiracy for which Bahlul was convicted rested on proof of more statutory elements than ordinary inchoate conspiracy requires, including intent to further the commission of war crimes, Pet. Supp. App. 137, and proof of an overt act in furtherance of a violation of the law of war, id. In addition, the conspiracy’s objects included completed war crimes. Id.
Third, the specific findings made by the commission, on which Bahlul’s conviction rests, largely eliminated the gap between his conviction and those types of conspiracies that are indisputably triable by military commission. Whatever remaining distance Congress might have closed in an exercise of its power to define and punish violations of the law of nations does not, in my view, amount to plain constitutional error.
Finally, I join thé court’s determination that Bahlul’s First Amendment and Equal Protection claims are foreclosed.[2] '
I
A
This case concerns Bahlul’s conviction by a military commission of conspiracy to violate the law of war, as that offense is defined in 10 U.S.C. § 950v(b)(28). A person commits conspiracy under Section 950v(b)(28) if he “conspires to commit one or more substantive offenses triable by military commission under this chapter, and * * * knowingly does any overt act to effect the object of the conspiracy.” 10 U.S.C. § 950v(b)(28). The substantive offenses triable by military commission under the chapter include murder of protected persons, attacking civilians, attacking civilian objects, murder in violation of the law of war, destruction of property in violation of -the law of war, terrorism, and providing material support for terrorism. See id, § 950v(b)(l), (2), (3), (15), (16), (24) & (25). The 2006 Act further provides that conspiracy “shall be punished, if death-results to one or more of the victims, by death or other such punishment as a military commission, under' this chapter may direct, and, if death does not result to any of the victims, by such punishment, other than death, as a military commission under this chapter may direct.” Id. § 950v(b).
In what is known as the “Define and Punish Clause,” Article I of the Constitution empowers Congress to “define and punish ■* * * Offences against the Law of Nations.” U.S. Const,, Art. I, § 8, cl. 10. *776 The Supreme Court has explained that “[o]ffences * * * against the law of nations, cannot, with any accuracy, be said to be completely ascertained and defined in any public code recognized by the common consent of nations.” United States v. Smith, 18 U.S. (5 Wheat.) 158, 158, 5 L.Ed. 57 (1820). Thus, “there is a peculiar fitness in giving the power to define as well as to punish” to Congress, “and there is not the slightest reason to doubt that this consideration had very great weight in producing the phraseology in question.” Id.; see Ex parte Quinn, 317 U.S. 1, 28, 63 S.Ct. 2, 87 L.Ed. 3 (1942).
At the same time, Congress’s power to punish offenses by military commission is constrained by the Constitution’s Judicial Power Clause, Art. Ill, § 2, cl. 1. That Clause provides that “[t]he judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority,” and “to Controversies to which the United States shall be a Party.” Id. Those “Cases” and “Controversies” include criminal prosecutions. See United States ex rel. Toth v. Quarles, 350 U.S. 11, 15, 76 S.Ct. 1, 100 L.Ed. 8 (1987). If a suit falls within the judicial power, then “the responsibility for deciding that suit rests with Article III judges in Article III courts,” and the Constitution forbids Congress to assign its resolution to another tribunal. See Stern v. Marshall, 564 U.S. 462, 484, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011).
B
While our prior en banc opinion cata-logued the factual background of this case, see Bahlul v. United States (Bahlul I), 767 F.3d 1, 5-8 (D.C. Cir. 2014) (en banc), portions of that factual history help to frame the legal questions that Bahlul presents.
Bahlul is a native of Yemen. In the late 1990s, he traveled to Afghanistan to join al Qaeda, and there he met Usama bin Laden. On October 12, 2000, al Qaeda attacked the USS Cole, killing seventeen American sailors and injuring thirty-nine others. Bahlul created a recruiting video for al Qaeda celebrating that attack, which he considered one of the best recruiting videos al Qaeda had produced. Pet. App. 134; see Bahlul I, 767 F.3d at 5.
Bin Laden subsequently appointed Bah-lul his personal assistant and secretary for public relations. Bahlul actively prepared for al Qaeda’s attacks on the United States on September 11, 2001. He arranged the loyalty oaths and prepared “martyr wills” for Mohamed Atta and Ziad al Jarrah, two of the hijackers who flew planes into the World Trade Center. Those “martyr wills” were propaganda declarations made in preparation for the attack and in which Atta and al Jarrah documented them and al Qaeda’s roles in the atrocities. Bahlul also provided research to bin Laden regarding the economic effects of the attacks. In addition, Bahlul volunteered to participate in the 9/11 attacks himself, but bin Laden thought he was too important to lose. Just before 9/11, Bahlul evacuated al Qaeda’s headquarters in Afghanistan with bin Laden and other senior al Qaeda leaders. Bahlul I, 767 F.3d at 6. After the attacks, Bahlul fled to Pakistan, where he was captured and turned over to the United States military. Id. at 6.
As relevant here, the United States charged Bahlul under the 2006 Act with conspiracy to commit war crimes. See 10 U.S.C. § 950v(b)(28). Bahlul was tried before a military commission convened at Guantanamo Bay. During the trial, Bahlul “flatly refused to participate in the military commission proceedings and instructed his trial counsel not to present a substantive defense.” Bahlul I, 767 F.3d at 10. *777 At no time did he raise any argument that Congress lacked the constitutional power to authorize a trial by military commission for conspiracy, or that in doing so, Congress ran afoul of the Define and Punish Clause or the Judicial Power Clause.
Before its deliberations, the commission was instructed that, to convict Bahlul of conspiracy under the 2006 Act, it must find “beyond a reasonable doubt” that Bahlul “entered into an agreement” with other members of al Qaeda to commit a substantive offense under the Act, “knew the unlawful purpose of the agreement and joined in it willingly,” and “knowingly committed” an overt act to bring about one of the objects of the agreement. Pet. Supp. App. 137. The military commission subsequently found Bahlul guilty of conspiracy under 10 U.S.C. § 950v(b)(28). In so doing, the commission specifically found that Bahlul committed ten overt acts as part of the conspiracy:
1. Traveled to Afghanistan with the purpose and intent of joining al Qae-da;
2. Met with Saif al’Adl, the head of the al Qaeda Security Committee, as a step toward joining the al Qaeda organization;
3. Underwent military-type training at an al Qaeda sponsored training camp then located in Afghanistan;
4. Pledged fealty, or “bayat,” to the leader of al Qaeda, Usama bin Laden, joined al Qaeda, and provided personal services in support of al Qaeda;
5. Prepared and assisted in the preparation of various propaganda products, including the video “The Destruction of the American Destroyer U.S.S. Cole,” to solicit material support for al Qaeda, to recruit and indoctrinate personnel to the organization and objectives of al Qaeda, and to solicit, incite and advise persons to commit Terrorism;
6. Acted as personal secretary and media secretary of Usama bin Laden in support of al Qaeda;
7. Arranged for Muhammed Atta, also known as Abu Abdul Rahman al Masri, and Ziad al Jarrah, also known as Abu al Qa’qa al Lubnani, to pledge fealty or “bayat,” to Usa-ma bin Laden;
8. Prepared the propaganda declarations styled as martyr wills for two of the 9/11 hijackers, Muhammed Atta and Ziad al Jarrah, in preparation for the acts of terrorism perpetrated by them in the United States on September 11,2001;
9. At the direction of Usama bin Laden, researched the economic effects of the September 11, 2001, attacks on the United States, and provided the results to Usama bin Laden; and
10. Operated and maintained data processing equipment and media communications equipment for the benefit of Usama bin Laden and other members of the al Qaeda leadership.
Pet. App. at 116-117.
The commission also found Bahlul guilty of conspiracy to commit seven charged object offenses: (i) murder of protected persons, (ii) attacking civilians, (iii) attacking civilian objects, (iv) murder in violation of the law of war, (v) destruction of property in violation of the law of war, (vi) terrorism, and (vii) providing material support for terrorism. Pet. App. 115; see 10 U.S.C. § 950(v)(b)(l), (3), (15), (16), (24) & (25). The military commission sentenced Bahlul to life imprisonment. Pet. App. 86.
*778 II
A
Before wading into any constitutional dispute, courts must first decide how deeply they should go—that is, which standard of review should apply. Those review standards are critical components of our justice system because they promote fairness, stability, and finality within the judicial process, and they give effect to the relative expertise of both the appellate court and the tribunals whose judgments are under review. See Puckett v. United States, 556 U.S. 129, 134, 129 S.Ct. 1423, 173 L.Ed.2d 266 (2009); United States v. Frady, 456 U.S. 152, 163, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982) (Standards of review “encourage all trial participants to seek a fair and accurate trial the first time around[.]”).
Ordinarily, questións of constitutional law .in criminal cases are decided de novo, and we plunge into plenary review. See, e.g., United States v. Straker, 800 F.3d 570, 629 (D.C. Cir. 2015). But this case is not ordinary. Bahlul seeks to overturn his conviction on the basis of constitutional arguments that he could have made before the military commission, but did not. Bah-lul nonetheless insists that we must consider his challenges de novo. See Pet. Br. 41.
Bahlul is wrong, in my view. Appellate courts are supposed to be courts of review, not first view. See Zivotofsky ex rel. Zivotofsky v. Clinton, — U.S. -, 132 S.Ct. 1421, 1430, 182 L.Ed.2d 423 (2012). And “ ‘[n]o procedural principle is more familiar * * * than that a constitutional right,’ or a right of any other sort, ‘may be forfeited in criminal as well as civil cases by the failure to make timély assertion of the right before a tribunal having jurisdiction to determine it.’ ” United States v. Olano, 507 U.S. 725, 731, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (quoting Yakus v. United States, 321 U.S. 414, 444, 64 S.Ct. 660, 88 L.Ed. 834 (1944)); United States v. Baucum, 80 F.3d 539, 541 (D.C. Cir. 1996) (noting “established Supreme Court precedent declining to address constitutional questions not put in issue by the parties”); see also, e.g., United States v. David, 96 F.3d 1477, 1482 (D.C. Cir. 1996) (criminal defendant waived constitutional challenge under the Commerce Clause).
In a civil case, Bahlul’s forfeiture would be fatal; we would not review his newly raised claims at all. See Nemariam v. Federal Democratic Republic of Ethiopia, 491 F.3d 470, 483 (D.C. Cir. 2007) (“[Ajbsent exceptional circumstances, the court of appeals is not a forum in which a litigant can present legal theories that it neglected to raise in a timely manner in proceedings below.”) (internal quotation marks omitted). Criminal cases, however,- are different. Typically, when a criminal defendant forfeits a challenge, even a constitutional one, an appellate court will still review the claim for “plain error.” Fed. R. Crim, P. 52(b); see, e.g., United States v. Cotton, 535 U.S. 625, 631-632, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002). A forfeited error warrants reversal as “plain error” only if the error was “clear” or “obvious” at the time it was made. Olano, 507 U.S. at 734, 113 S.Ct. 1770. Even then, the decision whether to correct the forfeited error lies “within -the sound discretion of the court of appeals.” Id. at 732, 113 S.Ct. 1770. Courts should not exercise that discretion unless the error “seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings.” United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985); see also Fed, R. Crim. P. 52(b) (“A plain error that affects substantial rights may be considered even though it was not brought to the court’s attention.”) (emphasis added).
While my colleagues believe that the constitutional importance of the issues presented and their implications warrant a *779 discretionary exercise of de novo review, see Wilkins Concurring Op. at 757; Joint Dissent at 806-09; see also Kavanaugh Concurring Op. at 758 n.1, limiting appellate review to plain errors when a criminal defendant fails.to object at trial serves a vital function within the criminal justice system. The plain-error rule “induce[s] the timely raising of claims and objections,” which in turn affords the trial court the opportunity both “to determine the relevant facts and adjudicate the dispute” in the first instance and, if warranted, to “correct or avoid the mistake so that it cannot possibly affect the ultimate outcome.” Puckett, 556 U.S. at 134, 129 S.Ct. 1423.
The contemporaneous-objection rule also prevents a defendant from “ ‘sandbagging’ the court—remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor,” Puckett, 556 U.S. at 134, 129 S.Ct. 1423— which is exactly what Bahlul is doing. “[E]ncourag[ing] all trial participants” instead “to seek a fair and accurate trial the first time around” promotes fairness to the court, to all of the parties, Frady, 456 U.S. at 163, 102 S.Ct. 1584, and to the public, as well as stability in the law. See generally Exxon Shipping Co. v. Baker, 554 U.S. 471, 487 n.6, 128 S.Ct. 2605, 171 L.Ed.2d 570 (2008) (“[WJaiver and forfeiture rules * * * ensure that parties can determine when an issue is out of the case, and' that litigation remains, to the extent possible, an orderly progression.”).
As our prior en banc opinion explained, Bahlul “flatly refused to participate in the military commission proceedings,” and to the extent that he objected at all to his trial, the objection “was couched entirely in political and religious terms.” Bahlul I, 767 F.3d at 10; see id. at 7 (“Bahlul waived all pretrial motions, asked- no questions during voir dire, made no objections to prosecution evidence, presented no defense and declined to make opening and closing arguments.”). Bahlul declared that he was a “prisoner[ ] of war and legal combatant[ ] based on [his] religion,” rejected the United States’ “earthly laws and international earthly laws,” questioned “how can there be a tribunal, a court, a complete court, and a fair court as long as they do not— when they do not accept our rules, our laws,” and then concluded that “there is going to be the tribunal of God on the day of judgments.” Pet. App. 109-112.
That generic diatribe against the proceedings writ large did not preserve the specific constitutional challenges that Bah-lul now presses. His complaints were far “too general to have alerted the trial court to the substance of [his] point,” United States v. Bolla, 346 F.3d 1148, 1152 (D.C. Cir. 2003) (Roberts, J.) (quotation marks omitted), or to have given the court or opposing counsel any notice of the constitutional character of his claim, see also United States v. Love, 593 F.3d 1, 11 (D.C. Cir. 2010) (defendant’s “general objection * * * was insufficient to preserve his arguments for appeal”); United States v. Breedlove, 204 F.3d 267, 270 (D.C. Cir. 2000) (an objection “couched in terms too general” to have put the trial court on notice of “the substance of the [claim]” was not preserved).
, To be sure, I do not believe a defendant must cite to any particular case or style arguments in a- particular way to sufficiently preserve a claim. See United States v. Rashad, 396 F.3d 398, 401 (D.C. Cir. 2005). All Bahlul had to do was “inform- the court and opposing counsel of the ruling he want[ed] the court to make and the ground for so doing.” Id. But Bahlul failed to do even that. He did not so much as mention the Constitution. He just categorically disdained the trial' process. Accordingly, I would hold Bahlul to the same standard that courts apply every day to other crimi *780 nal defendants who fail to preserve claims, and would review his new constitutional challenges only for plain error.
B
To evade the consequences of his forfeiture, Bahlul tries to package his Article III claim as a challenge to the military commission’s subject-matter jurisdiction, presumably because “defects in subject-matter jurisdiction require correction regardless of whether the error was raised” below. Cotton, 535 U.S. at 630, 122 S.Ct. 1781. That tactic fails. This Court has already held that the 2006 Act “explicitly confers jurisdiction on military commissions to try the charged offenses.” Bahlul I, 767 F.3d at 10 n.6. There thus should be no question that the military commission acted within its statutorily assigned jurisdiction. '
What Bahlul’s challenge really goes to is whether, in authorizing a law-of-war military commission to decide the conspiracy charge, Congress exceeded its constitutional authority under either Article I’s Define and Punish Clause or Article Ill’s Judicial Power Clause. In general, if a suit falls within the judicial power, then “the responsibility for deciding that suit rests with Article III judges in Article III courts.” Stern, 564 U.S. at 484, 131 S.Ct. 2594. But an exception exists for certain criminal prosecutions—specifically, criminal violations of the international laws of war—which constitutionally may be tried before military commissions. See Johnson v. Eisentrager, 339 U.S. 763, 786, 70 S.Ct. 936, 94 L.Ed. 1255 (1950). (“The jurisdiction of military authorities, during or following hostilities, to punish those guilty of offenses against the laws of war is long-established.”).
Bahlul argues that his prosecution for conspiracy before the military commission did not fall within any such -exception because it did not charge a violation of the international law of war. And because of that, Bahlul says, he was constitutionally entitled to have the charges against him brought before an Article III court.
The problem for Bahlul’s effort to frame that argument as jurisdictional is that “[e]ven the unconstitutionality of the statute under which the proceeding is brought does not oust a court of jurisdiction.” United States v. Williams, 341 U.S. 58, 65, 71 S.Ct. 595, 95 L.Ed. 747 (1951). As long as the military commission “exercises its power under a presumptively valid federal statute, it acts within its subject-matter jurisdiction!;.]” Baucum, 80 F.3d at 540. Indeed, in this Court’s previous en banc decision, we reviewed another separation-of-powers claim pressed by Bahlul—his Ex Post Facto Clause claim—for plain error, even though that challenge concerned the constitutionality of the 2006 Act, and thus the power of the United States to proceed against him. See Bahlul I, 767 F.3d at 10 & n.6; see also Carmell v. Texas, 529 U.S. 513, 531 n.21, 120 S.Ct. 1620, 146 L.Ed.2d 577 (2000) (the Ex Post Facto Clause is in part “aimed at * * * reinforcing the separation of powers”).
Bahlul’s claims here have no more jurisdictional aspect than did his ex post facto claims. His Define and Punish Clause argument is a challenge to the constitutionality of the 2006 Act. So too is Bahlul’s Judicial Power Clause argument: “The ‘Article IIP label changes nothing; by this Clause, Article III restricts the Congress’s power, not the power of the courts or military commissions.” Bahlul v. United States (Bahlul II), 792 F.3d 1, 31 (D.C. Cir. 2015) (Henderson, J., dissenting). To hold otherwise would mean that “a court would be required to raise [a Judicial Power Clause challenge] sua sponte each time it reviews a decision of a non-Article III tribunal,” even if the parties do not contest that issue. Id. at 32; see generally Bau *781 cum, 80 F.3d at 541 (Courts have “an obligation to address jurisdictional questions sua sponte”).
In short, Bahlul’s “belated assertion of a constitutional defect” does “not work to divest” the military commission of its jurisdiction to try him. Baucum, 80 F.3d at 541. Accordingly, his constitutional challenge to Congress’s authorization of his conspiracy prosecution before a military commission should be subject to the same contemporaneous-objection requirement as any other constitutional claim.
C
1
After that long preface, I arrive at the heart of Bahlul’s argument for de novo review: He contends that a criminal defendant can never forfeit an Article III structural claim. Specifically, Bahlul argues that the Judicial Power Clause of Article III prohibits Congress from assigning the trial of criminal conspiracies to a non-Article III tribunal, and that such a structural Article III claim is not subject to plain-error review.
For support, Bahlul points to the Supreme Court’s decision in Commodity Futures Trading Commission v. Schor, 478 U.S. 833, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986). In that case, Schor challenged the Commodity Futures Trading Commission’s jurisdiction over certain common-law counterclaims in civil reparations proceedings. Schor argued that Article III required that those traditionally common-law claims be decided by the Judicial Branch, not by an Executive Branch tribunal. Id. at 835-836, 106 S.Ct. 3245. While acknowledging that “Schor indisputably waived any right he may have possessed [by] expressly demanding] that [the other party] proceed on its counterclaim” before the Commission, the Supreme Court addressed the merits of his structural challenge de novo. Id. at 849-851, 106 S.Ct. 3245. In so doing, the Supreme Court explained that “Article III, § 1 safeguards the role of the Judicial Branch in our tripartite system by barring congressional attempts to transfer jurisdiction to non-Article III tribunals for the purpose of emasculating constitutional courts[.]” Id. at 850, 106 S.Ct. 3245 (quotation marks omitted, alterations in original). When that “structural principle is implicated in a given case,” the Court added, traditional rules “of consent and waiver cannot be dispositive” because those Article III limitations “serve institutional interests that the parties cannot be expected to protect.” Id. at 850-851, 106 S.Ct. 3245 (quotation marks, citations, and alterations omitted); see also Freytag v. Commissioner of Internal Revenue, 501 U.S. 868, 880, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991) (“Neither Congress nor the Executive can agree to waive * * * structural protection[s].”); Wellness Int’l Network, Ltd. v. Sharif, — U.S. -, 135 S.Ct. 1932, 1945 n.10, 191 L.Ed.2d 911 (2015) (“What Schor forbids is using consent to excuse an actual violation of Article III.”).
Bahlul takes those passages to mean that an Article III structural claim can never be forfeited, and that we are thus obligated to review his claim de novo. That overreads Schor. What the Supreme Court said is that “notions of consent and waiver cannot be dispositive.” Schor, 478 U.S. at 851, 106 S.Ct. 3245 (emphasis added). At most, that means that appellate courts have discretion to hear unpreserved Article III structural claims de novo in appropriate cases, not that they are obligated to do so. Subsequent Supreme Court precedent proves that point.
To begin with, in Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995), the Supreme Court held that the Securities Exchange Act’s requirement that federal courts reopen certain final judgments in private *782 civil actions violated Article III because the Article III judicial power is the power to decide cases conclusively. Id. at 213, 218, 115 S.Ct. 1447. The government had invoked Schor's non-waiver language in defense of the statute, reasoning that if the finality of federal court judgments implicated Article III, then res judicata would not be waivable either. Id. at 231, 115 S.Ct. 1447. The Supreme Court gave no quarter to that reading- of Schor: “The proposition that legal defenses based upon doctrines central to the courts’ structural independence can never be waived simply does not accord with our cases.” Id. What Schor meant, the Supreme- Court explained, was that a court could still “choose to consider his Article III challenge,” notwithstanding a litigant’s consent to an alternative tribunal, because when “ ‘Article III limitations are at issue, notions of consent and waiver cannot be dispositive[.J ” Id. at 232, 115 S.Ct. 1447 (first emphasis added; quoting Schor, 478 U.S. at 851, 106 S.Ct. 3245).
The Supreme Court reconfirmed twice just two Terms ago that courts may treat Article III structural claims as subject to waiver and forfeiture. In B&B Hardware, Inc. v. Hargis Industries, Inc., — U.S. -, 135 S.Ct. 1293, 191 L.Ed.2d 222 (2015), the Court held that a decision by the Trademark Trial and Appeal Board—a noh-Artiele III tribunal—is entitled to the same preclusive effect as a district court decision if the ordinary elements of issue preclusion are met, id. at 1299. In so holding, the Court eschewed consideration of any potentially “meritorious constitutional objection” under Article III because that argument was abandoned by Hargis Industries, and thus “it is not before us.” Id. at 1304 (citing Plant, 514 U.S. at 231-232, 115 S.Ct. 1447).
Continuing that pattern, in Wellness International Network, supra, the Court held that “Article III is not violated when the parties knowingly and voluntarily consent to adjudication by a bankruptcy judge” of a state-law claim that arose independently of bankruptcy law, 135 S.Ct. at 1939. In Stern v. Marshall, supra, the Court had held that, as a general matter, Article III forbids bankruptcy courts to enter final judgments on such claims, 564 U.S. at 500-501, 131 S.Ct. 2594. Wellness, however, created an exception to that general rule where both parties consent to bankruptcy-court adjudication.
Critically, at the end of its Wellness opinion, the Supreme Court remanded the case to the Seventh Circuit to decide whether Sharif s consent was knowing and voluntary, and whether “Sharif forfeited his Stem argument below.” 135 S.Ct. at 1949. That remand would, of course, have been pointless if Article III structural claims like the Stem claim can never be waived or forfeited. See also Sharif, 135 S.Ct. at 1949 (Alito, J., concurring in part and concurring in the judgment) (“[Respondent forfeited any Stem objection by failing to present that argument properly in the courts below. Stem vindicates Article III, but that does not mean that Stem arguments are exempt from ordinary principles of appellate procedure.”).
Of course, as the panel majority and concurrence well chronicled, the Supreme Court’s pronouncements in this area have been far from crystalline. See Bahlul II, 792 F.3d at 3-5; 23-24 (Tatel, J., concurring). But B&B Hardware and Wellness have done much to lift the fog. I accordingly conclude that Schor does not require us to wade into a constitutional thicket and review de novo Bahlul’s forfeited Article III structural challenge.
2
I agree with my colleagues, however, that Schor affords this Court some discretion to review a forfeited Article III claim de novo. See Kavanaugh Concurring Op. at *783 758 n.1, Joint Dissent at 806-07. But I would decline to exercise that discretion in this case for three reasons.
First, there is no structural reason to take up Bahlul’s fight with the Political Branches. Unlike Schor, Freytag, Stern, Plaut, B&B Hardware, and Wellness, which were all civil cases, this is a criminal case. That distinction matters because the consequences of forfeiture are materially different in civil and criminal contexts. In civil cases, a claim that a party waives or forfeits is generally gone for good. An appellate court will not review it under any standard of review. See Salazar ex rel. Salazar v. District of Columbia, 602 F.3d 431, 437 (D.C. Cir. 2010); Nemariam, 491 F.3d at 482-483; cf. Singleton v. Wulff, 428 U.S. 106, 121, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) (noting rare “circumstances in which a federal appellate court is justified in resolving an issue not passed on below, as where the proper resolution is beyond any doubt * * * or where injustice might otherwise result”).
In addition, civil cases can pose the risk of parties colluding and consenting to a non-Article III forum for resolution of their dispute. Absent discretionary review, such joint waivers of challenges to the judicial forum could effectively strip Article III courts of the ability ever to address the constitutionality of legislation reassigning the judicial power.
That perceived need to ensure some mechanism for enforcing the separation of powers and protecting the judicial power against incursions by the Political Branches seemingly motivated Schor's discretionary exception to traditional principles of waiver and forfeiture in civil cases. As the Supreme Court explained, Article III “limitations serve institutional interests that the parties cannot be expected to protect.” Schor, 478 U.S. at 851, 106 S.Ct. 3245; see also Peretz v. United States, 501 U.S. 923, 950, 111 S.Ct. 2661, 115 L.Ed.2d 808 (1991) (“Article III serves as an inseparable element of the constitutional system of checks and balances by preserving the role of the Judicial Branch in our tripartite system of government”) (quotation marks omitted).
Unlike civil cases, however, criminal cases like Bahlul’s present no similar need to work around the ordinary contemporaneous-objection rule. The whole reason my colleagues and I are even debating the application of the “plain-error” standard of review is that, in criminal cases, forfeited claims are not really forfeited at all. They are still subject to judicial review ánd decision; all that changes is the level of scrutiny. See Fed. R. Civ. P. 52(b); Olano, 507 U.S. at 733-735, 113 S.Ct. 1770. In other words, in criminal cases, a “forfeited” Article III claim is still reviewed and decided; it is just harder to win. See, e.g., Olano, 507 U.S. at 734, 113 S.Ct. 1770 (“A court of appeals cannot correct an error pursuant to Rule 52(b) unless .the error is clear under current law.”); In re Sealed Case, 573 F.3d 844, 851 (D.C. Cir. 2009) (“[A]n error can be plain if it violates an absolutely clear legal norm.”) (quotation marks omitted). That means that, unlike civil cases, the availability of plain-error review in criminal cases ensures that clear or obvious usurpations of Article III will not escape judicial scrutiny, regardless of whether a criminal defendant timely raised such objections below. •
Likewise, even when a criminal defendant affirmatively waives (rather than forfeits) a structural Article III challenge, the argument may, if- warranted, still be reviewed later through the lens of an ineffective-assistance-of-counsel claim. If the constitutional transgression is so clear that a failure to raise it was not “within the range of competence demanded of attorneys in criminal cases,” and if it prejudiced the defendant’s case, see United States v. Streater, 70 F.3d 1314, 1318 (D.C. Cir. *784 1995) (quoting Hill v. Lockhart, 474 U.S. 52, 56, 59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985)), an appellate court may decide the constitutional question.[3]
Second, in almost all of the Supreme Court cases granting review of a structural Article III question, the barrier to judicial review was waiver, not forfeiture. See Wellness, 135 S.Ct. at 1939 (noting “the parties’ consent” to bankruptcy court adjudication); Freytag, 501 U.S. at 878, 111 S.Ct. 2631 (“[Petitioners gave their consent to trial before the Special Trial Judge.”); Schor, 478 U.S. at 837, 106 S.Ct. 3245 (Schor himself “invoked the [Commission’s] reparations jurisdiction[.]”). The waivers arose, moreover, because Congress designed the challenged statutory schemes so that litigants would first choose to bring their claim in a non-Article III forum. In that way, Congress baked the barrier to judicial review right into the allegedly Article Ill-circumventing statutory scheme, thus presenting the question whether Congress could team up with litigants to divert the judicial power to a non-Article III tribunal. See Wellness, 135 S.Ct. at 1939 (considering “whether Article III allows bankruptcy judges to adjudicate [Stem] claims with the parties’ consent”); Schor, 478 U.S. at 851, 106 S.Ct. 3245 (“[T]he parties cannot by consent cure the constitutional difficulty.”).
By definition, the constitutionality of such statutory schemes could not be determined without bypassing the element of private choice that Congress used to trigger the non-Article III tribunal in the first instance. That presumably is why the Supreme Court explained in Plant that “[wjaiver subject to the control of the courts themselves”—rather than imposed by Congress—would be materially different to the constitutional analysis, “would obviously raise no issue of separation of powers, and would be precisely in accord with” Schor. Plant, 514 U.S. at 231-232, 115 S.Ct. 1447 (emphasis added).
This case, however, involves a forfeiture, not a waiver, of an Article III objection that was fully available to Bahlul throughout the military commission proceeding. Bahlul, like criminal defendants generally, had every opportunity and incentive to raise objections that (if successful) would have foreclosed his conviction or would have provided grounds for a full reversal on appeal. Indeed, criminal defendants as a class are profoundly self-interested when it comes to preserving substantial legal challenges to exercises of prosecutorial power. Thus the risk that criminal defendants will team up with the prosecution in a way that would otherwise preclude judicial enforcement of the separation of powers is something short of negligible.
For those reasons, the contemporaneous-objection rule does not pose the same practical barrier to constitutional review in *785 criminal cases that it did in SchoV s civil litigation context. Instead, in criminal prosecutions, “the claims of individuals * * * have been the principal source of judicial decisions concerning separation of powers and checks and balances.” Bond v. United States, 564 U.S. 211, 222, 131 S.Ct. 2355, 180 L.Ed.2d 269 (2011). Here as well, all that would be needed for a court to decide de novo the structural Article III question that Bahlul belatedly raises is for a defendant in one of the other pending military commission proceedings to timely raise it as a defense to prosecution in that forum.
Third, Bahlul has identified no unusual obstacles or exceptional circumstances that excuse his failure to raise his Article III claim before the military commission. He had the benefit of trained counsel and multiple procedural opportunities to voice his constitutional objections. Bahlul’s knowing and willful refusal to participate in his- trial should not now be rewarded by addressing his constitutional arguments de novo rather than under plain-error review. To the contrary, excusing Bahlul’s failure to bring his Article III structural claim would encourage similar sandbagging behavior from other military commission defendants. They would have nothing to lose by first trying their chances before the commission and, if unhappy with the results, pulling an Article III challenge out of their pocket in the hope of trying the case all over again in federal court (with the added benefit of the prosecution’s hand having been revealed).
Bahlul argues (Pet. Br. 37), and Judge Kavanaugh’s concurring opinion agrees (at 3 n.l), that the government failed to raise any forfeiture argument before the Court of Military Commission Review, or to argue for plain-error review, and thus it “has—in a word—forfeited [its] forfeiture argument here,” Pet. Br. 37 (quoting Solomon v. Vilsack, 763 F.3d 1, 13 (D.C. Cir. 2014)); see also Joint Dissent at 2-4.1 read our precedent and the record differently.
For starters, the rule that a party may forfeit a forfeiture argument applies to the preservation of a substantive legal claim in a civil case, like the discriminatory retaliation claim that was at issue in Solomon, 763 F.3d at 13. The issue in this criminal appeal, however, is not whether Bahlul’s constitutional claims get reviewed at all— the special plain-error rule in criminal cases ensures some type of review. The only question is which standard of review governs the appeal, and “[t]he Government cannot alter our standard of review—by concession, inadvertence, poor oral advocacy or otherwise.” Bahlul II, 792 F.3d at 32 n.3 (Henderson, J., dissenting); see United States v. Nueci-Pena, 711 F.3d 191, 196 n.5 (1st Cir. 2013) (reviewing for plain error although the government “erroneously assert[ed] that de novo review applied]”). That is because, as an appellate court, this court “must apply some standard of review to every issue it considers * * * [so] no party has the power to control our standard of review.” United States v. Vontsteen, 950 F.2d 1086, 1091 (5th Cir. 1992) (emphasis omitted).
Said another way, standards of review are not' claims that parties can choose to make or not in a case. Those review standards instead enforce structural judgments about the relative expertise of trial and appellate courts, and the need for efficiency, fairness, and stability in the judicial process. See Puckett, 556 U.S. at 134, 129 S.Ct. 1423. To illustrate, trial courts bear primary responsibility for fact-finding because they see the evidence and witnesses firsthand, and superintend eviden-tiary rules and the creation of the record in the case. An appellate court reviewing only the paper record is ill-positioned to make factual findings, and so we review factual- determinations only for clear error. *786 See Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). We would not find facts de novo if a party-failed to argue for—or even agreed to waive—clear-error review.
Plain-error review likewise enforces structural interests by ensuring that (i) potential errors can be stopped before harm occurs and resources are invested in a- trial that must be redone; (ii) trial court determinations are not ambushed on appeal by never-before-voiced objections; and (iii) the number of reversals is reduced, which promotes trust in the stability of court judgments and finality in the enforcement of criminal law. See Puckett, 556 U.S. at 134, 129 S.Ct. 1423; see also United States v. Hunter, 786 F.3d 1006, 1011 (D.C. Cir. 2015) (The contemporaneous-objection rule’s goal of timely rectifying errors “is not served when a defendant raises an objection after proceedings are complete and a ruling has been handed down.”).
On top of that, the record shows that the government did not forfeit its forfeiture argument. Before the Court of Military Commission Review, the government specifically argued that Bahlul “waived all motions, defenses or objections (except for lack of jurisdiction or failure to allege an offense) when he failed to raise any issues below.” Pet. App. 161. Indeed, this court’s prior en banc decision acknowledged that the government “argued for plain-error review before the [Court of Military Commission Review], in its original brief to the panel of this Court and. in its brief to the en banc court.” Bahlul I, 767 F.3d at. 10 n.5; see also Brief for the United States at 65, Bahlul v. United States, 2013 WL 297726 (D.C. Cir. Jan. 25, 2013) (arguing that Bahlul’s Define and Punish Clause, Ex Post Facto Clause, and Article III arguments “were forfeited below”).
To be sure, at oral argument before the panel, the government suggested that Bah-lul’s structural argument might not be for-feitable, see Pet. Supp. App. 234. But immediately thereafter, counsel asserted that “[t]he structural component of that argument is forfeitable,” id. at 235 (emphasis added). In addition, the government argued that Bahlul had not raised an Article III structural .claim at all. See id. at 234 (“I do not acknowledge that he was raising [a structural Article III argument].”). In my view, that is far too murky a foundation from which to launch this court into applying an unwarranted standard of review to adjudge the constitutionality of a joint exercise by the President and the Congress of their national security and war powers. See, e.g., Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 637, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring) (joint exercises of power by the Political Branches merit “the widest latitude of judicial interpretation”); see also Bank Markazi v. Peterson, — U.S. -, 136 S.Ct. 1310, 1328, 194 L.Ed.2d 463 (2016) (“[F]or-eign affairs” is “a domain ⅛ which the controlling role of the political branches is both necessary and proper.”); Center for National Security Studies v. United States Dep’t of Justice, 331 F.3d 918, 927 (D.C. Cir. 2003) (“[T]he judiciary owes some measure of deference to the executive in cases implicating national security[.]”).
Nor do I understand why labeling Bah-lul’s argument as “structural” should change the rules. The Constitution at every turn divides power not only horizontally between the federal branches of government, but also vertically between the national government,-the States, and individuals. It is hard to understand why Bah-lul’s Article III claim is any more struc *787 tural than Bahlul’s Ex Post Facto claim, to which this court sitting en banc accorded only plain-error review. See also Carmell, 529 U.S. at 531 n.21, 120 S.Ct. 1620 (Ex Post Facto Clause is in part “aimed at * * * reinforcing the separation of powers”).
The dissenting opinion adds that courts have a “strong interest * * * in maintaining the constitutional plan of separation of powers.”. Joint Dissent at 808 (quoting Glidden Co. v. Zdanok, 370 U.S. 530, 536, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962)). True. But when the only reason a separation-of-powers claim is not teed up is because the defendant chose not to raise it below, courts routinely apply plain-error review. See, e.g., United States v. Gonzalez, 682 F.3d 201, 203 (2d Cir. 2012) (reviewing separation-of-powers claim for plain error “because [the defendant] did not raise the issue[ ] below”); United States v. Anderson, 591 F.3d 789, 792 (5th Cir. 2009) (reviewing for plain error where the defendant “could have mentioned separation of powers [below] but, for whatever reason, he chose not to”).[4]
The dissenting opinion also suggests that this really-important-issue exception can be limited to intrusions on the judiciary’s Article III turf because then the court is granting de novo review for the courts’ “own benefit,” to “protect the judiciary’s role within our system of divided government,” Joint Dissent at 808, 807. But the Constitution separates power to protect the rights and liberty of the people, not to protect the courts for the courts’ sake. See New York v. United States, 505 U.S. 144, 182, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (“[T]he constitution divides authority * * * for the protection of individuals. * * * The Constitution’s division of power among the three branches is violated where one branch invades the territory of another, whether or not the encroached-upon branch approves the encroachment.”). Plus it seems to me wholly untenable for courts to decide that one criminal defendant’s Eighth Amendment challenge to his death sentence fails on plain-error review, see, e.g., United States v. McGarity, 669 F.3d 1218, 1255 (11th Cir. 2012), but an enemy combatant’s challenge to his capital conviction succeeds because it was to the court’s “own benefit” to afford it plenary review. Whatever considerations may appropriately weigh in favor of a discretionary decision to grant de novo review, the' dispositive factor in a criminal case should not be that the federal judiciary decides it has skin in the game.
Judge Kavanaugh’s concurring opinion concludes that the “extraordinary importance” of the constitutional questions is a reason to excuse Bahlul from the consequences of his forfeiture and grant de novo review. Kavanaugh Concurring Op. at 775 n.1. I think that gets the constitutional calculus exactly backwards. The separation of powers should counsel the greatest judicial hesitation when the Political Branches are jointly exercising their judgment in areas of national security, the conduct of war, and foreign relations. See generally Youngstown Sheet & Tube Co., 343 U.S. at 636-637, 72 S.Ct. 863 (joint actions of the Political Branches “personify the federal sovereignty” and “would be supported by the strongest of presumptions and the widest latitude of judicial interpretation”). Here the constitutional structure itself raises a yellow caution flag against unnecessary judicial intrusion, making it the better judicial course just to *788 decide “the narrower ground for adjudication of the constitutional questions in [a] case * * * first.” Plaut, 514 U.S. at 217, 115 S.Ct. 1447. Here, that means applying plain-error review.
III
To prevail on plain-error review, Bahlul must show that the. alleged error (i) is plain, (ii) affected his substantial rights, and (iii) seriously affected the fairness, integrity or public reputation of judicial proceedings. See Olano, 507 U.S. at 732-737, 113 S.Ct. 1770. For an error to be “plain,” it must be “clear” or “obvious.” Id. at 734, 113 S.Ct. 1770. “A ruling’s error is clear if, at the time it was made, a clear precedent in the Supreme. Court or this circuit established its erroneous character.” United States v. Terrell, 696 F.3d 1257, 1260 (D.C. Cir. 2012).
“Meeting all four prongs” of the plain-error test “is difficult, as it should be.” Puckett, 556 U.S. at 135, 129 S.Ct. 1423 (quotation marks omitted). Doubly so here because the Supreme Court has instructed that the actions of a military commission “are not to be set aside by the courts without the clear conviction that they are in conflict with the Constitution or laws of Congress constitutionally enacted.” Quirin, 317 U.S. at 2, 63 S.Ct. 2. Bahlul’s constitutional claims cannot survive that demanding review.[5]
Bahlul’s principal argument is that, in authorizing his prosecution before a military commission for what he labels “inchoate conspiracy,” Congress exceeded its legislative power under the Define and Punish Clause, U.S. Const., Art. I, § 8, cl. 10. Specifically, Bahlul argues that the conspiracy for which he was charged and convicted cannot be an “Offence[ ] against the Law of Nations,” within the meaning of Article I of the Constitution, because inchoate conspiracy is not a recognized crime under international law. Bahlul further argues that inchoate conspiracy, as a stand-alone offense, was traditionally triable by jury at common law and for that reason falls exclusively within the Article III judicial power.
Because Bahlul presses only an as-applied challenge to his own conviction under the 2006 Act, see Oral Arg. Tr. 6; Pet. Br. 57, I would not decide whether Congress has the constitutional power to authorize the prosecution generally of inchoate conspiracies before a military commission. Rather, for five reasons, it is neither clear nor obvious—in other words, it is not plain—that the particular statutory conspiracy of which Bahlul was convicted must be tried in an Article III court.
First, in arguing that Congress lacked the legislative authority to assign his conspiracy charge to a military commission for trial, Bahlul places great weight on the government’s concession that inchoate conspiracy has not yet been recognized as an offense against international law. Pet. Br. 16; see Brief for the United States at 50, Bahlul v. United States, 2013 WL 297726 (D.C. Cir. Jan. 25, 2013). But “we are not obligated to accept the Government’s concession.” Bahlul I, 757 F.3d at 18; see also United States v. Baldwin, 563 F.3d 490, 491 (D.C. Cir. 2009) (“We are not obligated to accept the government’s confession of error, particularly when there is reason to *789 doubt whether the government’s position is correct.”) (citation omitted). That is because “the separation of powers does not depend on the views of individual Presidents, nor on whether the encroached-upon branch approves the encroachment.” Free Enterprise Fund v. Public Company Accounting Oversight Bd., 561 U.S. 477, 497, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010) (citation and quotation marks omitted). More to the point, plain-error analysis looks at how clearly established governing law is, not the briefing strategies of particular parties.
Second, Bahlul’s asserted error—Congress’s power to criminalize traditional inchoate conspiracy in military commission proceedings—is not in fact implicated by his case. I agree with Judge Wilkins that the statutory conspiracy of which Bahlul was convicted goes beyond the elements of ordinary inchoate conspiracy. Traditionally, a conviction for inchoate conspiracy requires proof of only two elements: agreement between two or more persons, and intent thereby to achieve a certain objective. Wayne R. LaFave, Substantive Criminal Law § 12.2 (2015). Proof of neither an overt act nor a completed offense is required. See United States v. Shabani, 513 U.S. 10, 13-14, 115 S.Ct. 382, 130 L.Ed.2d 225 (1994) (‘We have consistently held that the common law understanding of conspiracy ‘does not make the doing of any act other than the act of conspiring a condition of liability.’”) (quoting Nash v. United States, 229 U.S. 373, 378, 33 S.Ct. 780, 57 L.Ed. 1232 (1913)). Moreover, an inchoate conspiracy could be tied to any object offense. Hogan v. O’Neill, 255 U.S. 52, 55, 41 S.Ct. 222, 65 L.Ed. 497 (1921).
Conspiracy under the 2006 Act is materially different. To begin with, in addition to requiring a specific intent to commit the overt acts, the 2006 Act also requires that the overt acts be committed with the intent “to effect the object of the conspiracy.” 10 U.S.C. § 950v(b)(28); see Pet. Supp. App. 137. Moreover, the only allowable objects of Bahlul’s conspiracy are “substantive offenses triable by military commission under” the Act. 10 U.S.C. § 950v(b)(28). Bahlul does not dispute that those substantive offenses include offenses against the law of war that may be tried before a military commission. On top of that, the statutory scheme seems to anticipate that a conviction will be linked to a completed offense. That is because the statute specifically ties the authorized sentences to the fate of the victims: the crime “shall be punished, if death results to one or more of' the victims, by death or such other punishment as a military commission under this chapter may direct, and, if death does not result to any of the victims, by such punishment, other than death, as a military commission under this chapter may direct.” Id.
In compliance with the statute, Bahlul was found to have committed ten overt acts, including, for example, preparing a recruiting video celebrating the USS Cole attack, acting as bin Laden’s personal secretary, and preparing martyr wills for two of the 9/11 hijackers. He was also found guilty of conspiracy to commit seven charged objects, including murder of protected persons, attacking civilians, murder in violation of the law of war, and terrorism.
Importantly, the military judge’s instructions to the commission enforced those distinct features of statutory conspiracy. The instructions expressly predicated Bahlul’s conviction on a finding “beyond a reasonable doubt” that Bahlul “personally committed at least one of the overt acts” charged. Pet. Supp. App. 140-141. In addition, for each object offense of the conspiracy, the commission was required to “find beyond a reasonable doubt” that Bahlul (i) “entered into an agreement” to commit the *790 offense; (ii) did so “intentionally”; (iii) “knew the unlawful purpose of the agreement”; (iv) “joined with the intent to further its unlawful purpose”; and (v) “committed an overt act in furtherance of the agreement.” Id. at 145; The instructions emphasized that the government must “prove[ ] beyond a reasonable doubt that the agreement intended every element of’ any offense that was determined to be an object of the conspiracy. Id. at 140.
Along with its guilty verdict, the commission returned detailed factual findings documenting its determination that Bah-lul’s conspiracy met those statutory elements. The commission found that Bahlul committed ten of the charged overt acts, and entered into an agreement that “intended every element” of all seven alleged object offenses, Pet. Supp. App. 140, including specifically “[mjurder of protected persons,” “attacking civilians,” “murder in violation of the law of war,” and “terrorism,” id. at 137, each of which violates Article 3 of the Geneva Convention, see Geneva Convention (IV) Relative to the Treatment of Prisoners of War art. 3, Aug. 12, 1949, 75 U.N.T.S. 2876 U.S.T. 3516.
Thus, for all of Bahlul’s arguments about Congress’s power to convict him by military commission of traditional or common-law inchoate conspiracy, the commission convicted him of a different and distinct statutory conspiracy offense, in which Bahlul (i) knew the objects of the conspiracy, which included multiple violations of the international law of war; (ii) joined an agreement to intentionally further those violations of the law of nations; (iii) personally intended to have every element of those international law of war offenses committed; and (iv) intentionally undertook the overt acts to further the agreement’s unlawful purposes. Bahlul’s use of the common law as a constitutional yardstick thus overlooks the elements of the statutory offense of which he was actually convicted and the dearth of precedent suggesting that substantive offenses against the international-law of war were traditionally tried in courts at common law. Accordingly, whatever the scope of congressional authority to consign other stand-alone conspiracy offenses to a non-Article III tribunal, it is not plain that conspiracy to commit international war crimes as carefully defined in the 2006 Act-falls exclusively within the Article III judicial power.
Third, given the specific elements of Bahlul’s conspiracy conviction, any delta between his conspiracy offense and those offenses that international law proscribes is too narrow to rise to the level of plain constitutional error.
To begin with, international law has recognized conspiracy as a stand-alone offense for certain illegal acts that bear a close resemblance to Bahlul’s charged conduct. For example, international law has long allowed prosecution for conspiracy to wage aggressive war (also known as common plan to wage aggressive war). See 1 TRIAL op the Major War Criminals Before the International Military Tribunal: Nuremberg, 14 November 1945-1 October 1946, p. 225 (1947). In that respect, international law recognizes that “[planning and preparation are essential to the making of war,” and “[cjontinued planning, with aggressive war as the objective” may be punished as a violation of the law of war. Id. at 224-225; see also Hamdan v. Rumsfeld, 548 U.S. 557, 610, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006) (plurality opinion) (describing “common plan to wage aggressive war” as “a crime against the peace [that] requires for its commission actual participation in a ‘concrete plan to wage war’”) (quoting 1 Trial of Major War Criminals, supra, at 225).
Like Bahlul’s conviction, conspiracy to commit aggressive war at Nuremberg turned on the -commission of overt acts *791 directly tied to waging aggressive war and an object offense that was itself a crime against international law. Nothing in constitutional text or settled precedent plainly foreclosed Congress from bridging the gap between the formal waging of such war by officials of Nazi Germany and al Qaeda’s waging of terrorist aggression against the United States, ■
Modern statutes defining international law offenses also permit punishment for conspiracy to commit genocide as a standalone offense. See Updated Statute of the International Criminal Tribunal for the Former Yugoslavia Art. 4 (2009) (ICTY Statute); Statute of the International Tribunal for Rwanda Art. 2 (1994); Convention on the Prevention and Punishment of the Crime of Genocide Art. 3, Dec. 9,1948, 78 U.N.T.S. 277, The Statute of the International Tribunal for the Former Yugoslavia, for example, expressly recognizes “conspiracy to commit genocide.” Id., Art. 4. The statute- defines genocide as,- inter alia, “killing members of [a] group,” “causing serious bodily or mental harm to members of [a] group,” or “deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part,” “with intent to destroy, in whole or in part, [that] national, ethnical, racial or religious group[.]” Id., Art. 4(2)(a); see Simon v. Republic of Hungary, 812 F.3d 127, 143 (D.C. Cir. 2016) (similar, citing the Convention on the Prevention of the Crime of Genocide).
Of course, the object offenses tied to Bahlul’s conviction do not include genocide. But Bahlul’s overt acts do include attempts to kill and cause serious bodily and mental harm on members of a specific group at least in part because of their protected characteristics. Bahlul’s video celebrating the USS‘ Cole attack calls for jihad against the United States and blames “Western infidels” for Muslim suffering. Bahlul I, 767 F.3d at 5-6. Bahlul’s video has been translated into several languages and widely distributed. Id. at 6. Given that international law proscribes a calculated conspiracy to exterminate individuals on the basis of their nationality (outside the context of formal war), constitutional law does not plainly foreclose Congress from using its Define and Punish Clause authority to outlaw a conspiracy to intentionally commit mass murder of and to incite acts of violence against Americans, at least when combined with an overt act furthering an object offence that violates international law.
On top of that, international law recognizes some conspiracy offenses as an independent source of criminal liability. In particular, international law permits conviction for joint criminal enterprise where “a plurality of persons participates] in the criminal plan”; there is “a common purpose which amounts to or involves the commission of a crime”; and “the accused[] participates] in the common design.” Guilia Bigi, Joint Criminal Enterprise in the Jurisprudence of the International Criminal Tribunal for the Former Yugoslavia and the Prosecution, of Senior Political and Military Leaders, in 14 Max Pianck Yearbook of United Nations Law 56 (2010). The Rome Statute, for example, makes a person “criminally responsible and liable for punishment for a crime” if that person “contributes to the commission or attempted commission of such a crime by a group of persons acting with a common purpose.” Rome Statute of the International Criminal Court[1] Art. 25(3)(d), July 17, 1998, 2187 U.N.T.S. 90. The contribution must be “intentional,” and must be “made with the aim of furthering the criminal activity or criminal purpose of the group” or “in the knowledge of the intention of the group to commit the crime.” Id. Given its settled -roots in international law, there is no dispute that *792 Congress could authorize a military commission prosecution for joint criminal enterprise. See Oral Arg. Tr. 10.
Classically, joint criminal enterprise differs from ordinary inchoate conspiracy by its requirement of action in furtherance of the agreement. See Allison Marston Danner & Jenny S. Martinez, Guilty Associations: Joint Criminal Enterprise, Command Responsibility, and the Development of International Criminal Law, 93 Cal. L. Rev. 75, 119 (2005). The offense is also doctrinally distinct from traditional conspiracy because it is a form of liability, while inchoate conspiracy is a freestanding substantive crime. Id. at 119; see also Hamdan, 548 U.S. at 610 n.40, 126 S.Ct. 2749 (plurality opinion) (“[Jjoint criminal enterprise” is a “species of liability for the substantive offense (akin to aiding and abetting), not a crime on its own.”).
But as applied to this case, the distinctions between a conspiracy conviction under the 2006 Act and what a conviction for joint criminal enterprise would have entailed are narrower than they would be for traditional inchoate conspiracy. Bahlul’s conspiracy charge under the 2006 Act did require explicit proof of an overt act and involved a completed object offense. As a result, “it is not clear whether th[e] formal distinction between [joint criminal enterprise] and conspiracy carries much practical weight.” Danner & Martinez, supra, at 119; see Peter Margulies, Defining, Punishing and Membership in the Community of Nations, 36 FoRdham Int’l L.J. 1, 86 (2013) (The “pairing of joint intention with action [in the Rome Statute’s codification of Joint Criminal Enterprise] is very close to conspiracy—close enough that no individual charged with the latter as a mode of liability can claim lack of notice.”). Whatever the distinctions between the two, they do not make a clear or plain constitutional difference.
Beyond that, Bahlul conceded at oral argument, Oral Arg. Tr. 9-10, that the Constitution would permit his trial before a military commission on a Pinkerton conspiracy theory of liability, see Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). The Pinkerton doctrine of conspiracy holds an individual vicariously liable for reasonably foreseeable substantive crimes committed by his co-conspirators in furtherance of the conspiracy. See id. at 646-647, 66 S.Ct. 1180.
Pinkerton “intertwines conspiracy as a substantive crime with conspiracy as a theory of liability[.]” Danner & Martinez, supra, at 116; see, e.g., United States v. Edmond, 924 F.2d 261, 268 (D.C. Cir. 1991) (Pinkerton established that commission of a substantive offense and conspiracy to commit it are distinct crimes, and simultaneously authorized holding a conspirator responsible for substantive criminal acts committed by a co-conspirator). But Pinkerton liability is distinct from inchoate conspiracy because it relies on the imputation of co-conspirators’ completed offenses, and requires a finding that they were “reasonably foreseeable] as a necessary or natural consequence of the unlawful agreement.” Pinkerton, 328 U.S. at 648, 66 S.Ct. 1180; see also Danner & Martinez, supra, at 115-116. In Bahlul’s case, because he joined agreements to intentionally commit war crimes, acted in furtherance of those agreements, and was intricately involved in preparing two 9/11 perpetrators for their attacks, it is far from plain that the acts of terrorism that flowed directly from his conspiratorial activities were not precisely what he intended to have happen, let alone “reasonably foresee[able] as a necessary or natural consequence of the unlawful agreement.” Pinkerton, 328 U.S. at 648, 66 S.Ct. 1180. At least the gap between the two forms of conspiracy is not so clear as to tie Con *793 gress’s legislative hands on plain-error review.
Bahlul’s position—essentially adopted by the dissenters, see Joint Dissent at 52-60—is that, although a hypothetical conviction for common plan to wage aggressive war, joint criminal enterprise, or Pinkerton conspiracy would have been valid, his conviction here was unconstitutional because the 2006 Act outlaws a stand-alone “conspiracy.” Oral Arg. Tr. 9-10. But there is no dispute that the law of nations permits some freestanding conspiracy convictions—for aggressive war and genocide. So the fact that the 2006 Act denominates a stand-alone conspiracy offense cannot make all the difference.
If Bahlul means by this argument that the 2006 Act might allow someone else to be convicted of ordinary, common-law-like conspiracy, that is not his argument to make. Outside the First Amendment context (which is not plausibly implicated here), a criminal defendant whose culpable conduct falls within the constitutional range cannot upend that conviction just because the statute’s alleged overbreadth might permit the unconstitutional conviction of another individual. See United States v. Williams, 553 U.S. 285, 304, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008) (“[Ordinarily ‘a plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.’ ”) (quoting Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982)) (alteration omitted).
What matters here is that Bahlul’s own conviction was not for ordinary inchoate conspiracy. It was for a carefully crafted form of statutory conspiracy that, on the record of this case, resembles in important ways those forms of conspiracy or collective action that get the international-law nod of approval. Surely plain-error review cannot turn on the same nuances of varying conspiracy-liability theories that confound most first-year law students. See Terrell, 696 F.3d at 1260 (requiring on-point precedent in the Supreme Court or this circuit to establish clear error).
Contrary to the worry expressed in the dissenting opinion (at 55-60), that conclusion does not find Bahlul guilty of a crime for which he was not charged or convicted. Instead, I decide only that, given the elements of the statutory crime of which Bah-lul was convicted and its comparability in some key respects to conspiracies that the parties agree transgress international law, Bahlul’s conviction of conspiracy under the 2006 Act did not plainly exceed Congress’s constitutional authority.
Fourth, Supreme Court precedent has not required slavish adherence to the precise contours of explicitly recognized international law as a precondition to Congress’s exercise of its power under the Define and Punish Clause. For instance, in United States v. Arjona, 120 U.S. 479, 7 S.Ct. 628, 30 L.Ed. 728 (1887), the Court held that the Define and Punish Clause gave Congress the authority to punish an individual who counterfeited another nation’s securities, id. at 487-488, 7 S.Ct. 628. The Court did not identify any express international proscription on counterfeiting securities, but explained that the prohibition on counterfeiting money might, “with just propriety, be extended to the protection of this more recent custom among bankers of dealing in foreign securities[.]” Id. at 486, 7 S.Ct. 628. For that reason, the Supreme Court concluded, “a law which is necessary and proper to afford this protection” fell within Congress’s Article I power because the law was “needed to carry into execution a power conferred by the constitution on the government of the United States exclusively.” Id.
*794 Arjona thus held that Congress’s power to criminalize an offense did not turn on whether the act was expressly prohibited by international law. Instead, it was sufficient that proscribing certain conduct was “necessary and proper” to protect rights implicitly recognized by the law of nations.
Likewise, in In re Yamashita, 327 U.S. 1, 66 S.Ct. 340, 90 L.Ed. 499 (1946), the Supreme Court affirmed the conviction of a Japanese military commander before á military commission for “permitting [his troops] to commit brutal atrocities and other high crimes against people of the United States and of its allies and dependencies,” id. at 13-14, 66 S.Ct. 340. Even though international law had not expressly recognized liability for such supervisorial conduct, the Court noted that international law outlined the commander’s duty to uphold the law of war. See id. at 15-16, 66 S.Ct. 340 (Geneva Conventions imposed on the commander an affirmative “duty * * * to provide for the details of execution of the foregoing articles (of the convention)”); cf. id. at 40, 66 S.Ct. 340 (Murphy, J., dissenting) (protesting that Yamashita’s conviction was not “based upon charges fairly drawn in light of 'established rules of international law and recognized concepts of justice”). What proved critical in Yama-shita was that the commander’s offense— the failure to restrain subordinate troops—“would almost certainly result in violations which it is the purpose of the law of war to prevent.” Id. at 15, 66 S.Ct. 340 (majority opinion).
So too here. Bahlul’s statutory conspiracy conviction and the commission’s factual determinations on which it rested are closely tied to offenses against the “Law of Nations”'within the meaning of the Constitution’s Define and Punish Clause, Art. I, § 8, el. 10. At a bare minimum, plain-error review does not leave Congress powerless to do nothing more than mimic the precise contours of extant international precedent.
Fifth and finally, plain-error review requires Bahlul to identify “clear precedent” from this court or the Supreme Court “establishing] [the] erroneous character” of his conspiracy conviction, Terrell, 696 F.3d at 1260. But the closest precedent from this court is our prior en banc decision in Bahlul I, which points in the opposite direction. There, a majority of this court held that it is not “plain” that conspiracy falls outside the statutory limits on crimes triable by military commission. 767 F.3d at 22. Because the Ex Post Facto Clause, U.S. Const., Art. I, § 9, cl. 3, forbade reliance on the 2006 Act, the court had to determine whether Bahlul’s inchoate conspiracy conviction fell plainly outside the “law of war” within the meaning of the Articles of War, 10 U.S.C. § 821. See Bahlul I, 767 F.3d at 22. Under the Articles of War, conspiracy had to be an offense that “by the law of war may bé tried by military commissions.” 10 U.S.C. § 821.
As this court explained in Bahlul I, the Supreme Court has not yet resolved the question whether “law of war” means only the international law of war or includes “the common law of war developed in U.S. military tribunals.” 767 F.3d at 22-23. But on plain-error review, it was sufficient that the Supreme Court has relied on domestic precedent in addition to international' law to ascertain whether a crime is triable as an offense against the “law of war.” Id. at 23-24 (citing Hamdan, 548 U.S. at 603-609, 126 S.Ct. 2749 (plurality opinion); id. at 689-704, 126 S.Ct. 2749 (Thomas, J., dissenting); Quirin, 317 U.S. at 31-35, 42 n.14, 63 S.Ct. 2; Yamashita, 327 U.S. at 19-20, 66 S.Ct. 340).
So too here, three examples of domestic wartime precedent make it far from plain that, conspiracy under the 2006 Act would not be triable by military commission.
*795 For starters, the individuals held ■ responsible for President Lincoln’s assassination were charged 'With and convicted of “combining, confederating, and conspiring together * * * to kill and murder, within the Military Department of Washington, and within the fortified and intrenched lines thereof, Abraham Lincoln[.]” H.R. Doc. No. 314, 55th Cong., 3d Sess., 696 (1899). President Andrew Johnson personally approved the convictions, relying in part on the opinion of Attorney General James Speed advising that the individuals could be tried for conspiracy before a military commission. 11 Op. Att’y Gen. at 297. As this court explained in Bahlul I, “this highest-level Executive Branch deliberation is worthy of respect in construing the law of war.” 767 F.3d at 25 (citing Sosa v. Alvarez-Machain, 542 U.S. 692, 733-734, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004)).
In addition, Nazi saboteurs who entered the United States intending to destroy industrial facilities were convicted of conspiracy in Quirin and in Colepaugh v. Looney, 235 F.2d 429, 431-432 (10th Cir. 1956). While the Supreme Court and the Tenth Circuit each affirmed the saboteurs’ convictions based on other charges, those decisions are “prominent example[s]” of conspiracy charges reached in law-of-war military commissions, approved by the executive, and permitted by the judiciary, including the Supreme Court. Bahlul I, 767 F.3d at 26.
Lastly, during the Korean War, General Douglas MacArthur ordered that persons accused of “conspiracies and agreements to commit * * * violations of the laws and customs of war of general application” be tried by military commission. Letter Order, Gen. HQ, United Nations Command, Tokyo, Japan, Trial of Accused War Criminals (Oct. 28, 1950) (Rules of Criminal Procedure for Military Commissions, Rule 4).
• While not definitively answering the ultimate constitutional question, “the historical practice of our wartime tribunals is sufficient to make it not ‘obvious’ that conspiracy was not traditionally triable by [a] law-of-war military commission” under the Articles of War as an offense against the law of war. Bahlul I, 767 F.3d at 27 (citing Olano, 507 U.S. at 734, 113 S.Ct. 1770). Further, because the “law of war” in the Articles of War “incorporate[s] by reference, as within the jurisdiction of military commissions, all offenses which may constitutionally be included within that jurisdiction,” Quirin, 317 U.S. at 30, 63 S.Ct. 2, those same domestic precedents underscore the absence of any plain constitutional error in Bahlul’s statutory conspiracy conviction by a military commission.
IV
Bahlul’s other constitutional challenges also cannot surmount plain-error review.
First, he argues that his conspiracy conviction runs afoul of the Constitution’s Judicial Power Clause, Art. Ill, § 2, cl. 1. But precedent has long established that criminal prosecutions for violations of the law of war do not fall within the exclusive jurisdiction of Article III courts. See, e.g., Johnson v. Eisentrager, 339 U.S. 763, 786, 70 S.Ct. 936, 94 L.Ed. 1255 (1950) (lawfulness of military commission jurisdiction is “well-established”); Bahlul II, 792 F.3d at 7 (citing Quirin, 317 U.S. at 46, 63 S.Ct. 2). Bahlul’s argument that his statutory conspiracy conviction falls beyond the law of nations amounts to nothing more than a repackaging of his Define and Punish Clause argument. The error—if any—is just as far from plain under Article III as it is under Article I.
Second, Bahlul contends that his conviction violated his right to a trial by jury. Bahlul is correct that Article III, Section 2, Clause 3 of the Constitution provides *796 that “[t]he Trial of all Crimes, except in Cases of Impeachment, shall be by Jury.” But if any error occurred, it was not plain or obvious.
To begin with, no established precedent even extends the jury trial right to non-citizens being held outside the United States’ sovereign territory. In Boumediene v. Bush, 553 U.S. 723, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008), the Supreme Court for the first time extended constitutional protection to an alien at Guantanamo Bay, id. at 795, 128 S.Ct. 2229. That holding, however, was “explicitly confined * * * ‘only to the extraterritorial reach of the Suspension Clause,” and expressly “disclaimed any intention to disturb existing law governing the extraterritorial reach of any constitutional provisions, other than the Suspension Clause.” Rasul v. Myers, 563 F.3d 527, 529 (D.C. Cir. 2009) (quoting Boumediene, 553 U.S. at 795, 128 S.Ct. 2229). And it is settled that certain other constitutional provisions do not protect aliens outside the sovereign United States. See, e.g., United States v. Verdugo-Urquidez, 494 U.S. 259, 261, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990) (the Fourth Amendment does not apply to the search and seizure of property owned by a nonresident alien and located abroad); Kiyemba v. Obama, 555 F.3d 1022, 1026 & n.9 (D.C. Cir. 2009) (Due Process Clause of Fifth Amendment does not apply to aliens at Guantanamo), vacated, 559 U.S. 131, 130 S.Ct. 1235, 175 L.Ed.2d 1070 (2010) (per curiam), reinstated on remand, 605 F.3d 1046 (D.C. Cir. 2010) (per curiam), cert. denied, 563 U.S. 954, 131 S.Ct. 1631, 179 L.Ed.2d 925 (2011).
If anything, precedent undermines Bah-lul’s claim. In Quirin, the Supreme Court held that Nazi saboteurs had no right to trial by jury, explaining- that “trial by a jury of the vicinage where the crime was committed” was a “procedure[] unknown to military tribunals, which are not courts in the sense of the Judiciary Article.” 317 U.S. at 39, 63 S.Ct. 2. Article Ill’s Jury Trial Clause, the Supreme Court elaborated, “preserved] unimpaired trial by jury in all those, cases in which it had been recognized by the common law.” Id. But it did not go so far as “to have extended the right to demand a jury to trials by military commission, or to have required that offenses against the law of war not triable by jury at common law be tried only in the civil courts.” Id. at 40, 63 S.Ct. 2.
Bahlul contends that, under Quirin, the jury-trial right hinges on whether a charge was triable by jury at common law, not whether the charge was also properly tried before the military commission. Pet. Br. 27; Oral Arg. Tr. 15-16. The sabotage charge in Quirin did not entail a jury trial right at common law, but conspiracy did. See Callan v. Wilson, 127 U.S. 540, 549, 8 S.Ct. 1301, 32 L.Ed. 223 (1888).
Subsequent precedent indicates otherwise. See Whelchel v. McDonald, 340 U.S. 122, 127, 71 S.Ct. 146, 95 L.Ed. 141 (1950) (“The right to trial by jury guaranteed by the Sixth Amendment is not applicable to trials by courts-martial or military commission.”); Sanford v. United States, 586 F.3d 28, 35 (D.C. Cir. 2009) (“[T]he Sixth Amendment right to a criminal jury trial does not, itself, apply to the military.”); cf. Granfinanciera S.A. v. Nordberg, 492 U.S. 33, 53, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989) (“[I]f Congress may assign the adjudication of a statutory cause of action to a non-Article III tribunal, then the Seventh Amendment poses no independent bar to the adjudication of that action by a nonju-ry factfinder.”). There accordingly is nothing plain or obvious about Bahlul’s entitlement to a trial by jury.
Third, Bahlul argues that the First Amendment’s free speech guarantee forecloses a conviction for his political speech, namely the al Qaeda recruitment video he *797 created about the terrorist attack on the USS Cole. Pet. Br. 38, 40, Bahlul II, 2014 WL 3962849. As with Bahlul’s claimed jury-trial right, no governing precedent extends First Amendment protection to speech undertaken by non-citizens on foreign soil, so no plain error occurred.
What is settled, moreover, is that the First Amendment offers no shield to speech like Bahlul’s that is “directed to inciting or producing imminent lawless action and * * * [is] likely to incite or produce such action.” Holder v. Humanitarian Law Project, 561 U.S. 1, 43-44, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010) (alterations omitted; quoting Brandenburg v. Ohio, 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (per curiam)); see also Bahlul, 820 F.Supp.2d at 1249 (Bahlul’s USS Cole recruitment video was “aimed at inciting viewers to join al Qaeda, to kill Americans, and to cause destruction.”).
Fourth, Bahlul argues that the 2006 Act violates the Fifth Amendment’s guarantee of equal protection because it authorized trials before a military commission for alien enemy combatants, but not for enemy combatants who are U.S. citizens. The short answer is that no relevant precedent plainly or clearly supports the application of equal protection principles in this law-of-war context to foreign enemy combatants.
Y
In sum, I would review Bahlul’s constitutional challenges only for plain error. Under that standard, I would hold that his conviction for conspiracy under the 2006 Act by a law-of-war military commission did not plainly exceed Congress’s power under Article I’s Define and Punish Clause or trench upon Article Ill’s assignment of the judicial power to federal courts. Nor did his conviction violate any of the other constitutional protections Bahlul invokes: I accordingly concur in the judgment affirming Bahlul’s conviction.

. Camreta v. Greene, 563 U.S. 692, 705, 131 S.Ct. 2020, 179 L.Ed.2d 1118 (2011) (internal quotation marks and citation omitted); see also Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 346-347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandéis, J., concurring) (explaining that courts should not “anticipate a question of constitutional law in advance of the necessity of deciding it”; neither should they “formulate a rule of constitutional law *775 broader than is required by the precise facts to which it is to be applied”),

. I refer to the defendant as Bahlul, rather than al Bahlul, because that is the appellation employed by his counsel on his behalf.

. In a series of cases challenging the Federal Magistrates Act, Pub. L. No. 90-578, 82 Stat. 1107-1119 (1968), the Supreme Court addressed constitutional objections to adjudications by non-Article III federal magistrate judges in criminal cases. However, none of those cases presented a structural Article III question because the district court’s de novo review ensured that the operative decision was made by an Article III judge. See, e.g., Peretz, 501 U.S. at 937, 111 S.Ct. 2661 (”[N]o * * * structural protections are implicated” because ‘‘[t]he ultimate decision whether to invoke the magistrate’s assistance is made by the district court, subject to veto by the parties.”) (quotation omitted); United States v. Raddatz, 447 U.S. 667, 683, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980) (The “delegation does not violate Art. Ill so long as the ultimate decision is made by the district court.”); see also Gomez v. United States, 490 U.S. 858, 874, 109 S.Ct. 2237, 104 L.Ed.2d 923 (1989) (construing the Act not to authorize magistrate judges to supervise jury selection in part because the court ”harbor[ed] serious doubts that a district judge could review this function meaningfully”).

. See also, e.g., United States v. Clark, 634 F.3d 874, 877 (6th Cir. 2011); United States v. Conaway, 612 F.3d 642, 646 (7th Cir. 2010); United States v. Evans, 587 F.3d 667, 671 (5th Cir. 2009); United States v. Rusan, 460 F.3d 989, 992 (8th Cir. 2006); United States v. Pojilenko, 416 F.3d 243, 249 n.6 (3d Cir. 2005).

. The Supreme Court explained in Hamdan v. Rumsfeld, 548 U.S. 557, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006), that "the precedent” supporting trial by military commissipn "must be plain and unambiguous” in those instances "[w]hen * * * neither the elements of the offense nor the range of permissible punishments is defined by statute or treaty,” id. at 602, 126 S.Ct. 2749. That standard does not apply here because the 2006 Act specifically defines the elements of its conspiracy provision and identifies it as an offense triable by military commission. 10 U.S.C. § 950v(b)(28).

.There is some controversy in recent years about whether the Salerno standard universally applies. See Hodge v. Talkin, 799 F.3d 1145, 1156 (D.C. Cir. 2015) ("[T]he Court has also indicated that the standard for facial invalidity may be less stringent in some situations, instead turning on whether the statute lacks any ‘plainly legitimate sweep.'(quoting Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008))). At the very least, "all agree that a facial challenge must fail where the statute has a plainly legitimate sweep,” id. at 450, 128 S.Ct. 1184 (internal quotations marks omitted), a standard Bahlul’s conviction necessarily survives given that the facts of his own case do not violate Article III. See also id. ("[W]e must be careful not to go beyond the statute’s facial requirements and speculate about ‘hypothetical’ or ‘imaginary’ cases.”),